Noel SAITO, Plaintiff
Below, Appellant,

v.

McKESSON HBOC, INC., a Delaware
corporation, Defendant Below,
Appellee.

No. 376, 2001.

Supreme Court of Delaware.

Submitted: March 12, 2002.

Decided: June 11, 2002.

Pamela S. Tikellis, Esquire (argued), Robert J. Kriner, Jr., Esquire and Beth Deborah Savitz, Esquire, of Chimicles & Tikellis, LLP, Wilmington, Delaware; Robert S. Green, Esquire, and Robert A. Jigarjian, Esquire, of Girard & Green, LLP, San Francisco, California, for Appellant.

Anthony W. Clark, Esquire, and Paul J. Lockwood, Esquire (argued), of Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, Justices and HARTNETT,[1] Justice (Retired), constituting the Court en Banc.

BERGER, Justice.

In this appeal, we consider the limitations on a stockholder's statutory right to inspect corporate books and records. The statute, 8 *Del.C.* § 220, enables stockholders to investigate matters "reasonably related to [their] interest as [stockholders]" including, among other things, possible corporate wrongdoing. It does not open the door to the wide ranging discovery that would be available in support of litigation. For this statutory tool to be mean-

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 38 and 29 Del.C. § 5610(a)(2).

ingful, however, it cannot be read narrowly to deprive a stockholder of necessary documents solely because the documents were prepared by third parties or because the documents predate the stockholder's first investment in the corporation. A stockholder who demands inspection for a proper purpose should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose. Thus, where a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders.

Factual and Procedural Background

On October 17, 1998, McKesson Corporation entered into a stock-for-stock merger agreement with HBO & Company ("HBOC"). On October 20, 1998, appellant, Noel Saito, purchased McKesson stock. The merger was consummated in January 1999 and the combined company was renamed McKesson HBOC, Incorporated. HBOC continued its separate corporate existence as a wholly-owned subsidiary of McKesson HBOC.

Starting in April and continuing through July 1999, McKesson HBOC announced a series of financial restatements triggered by its year-end audit process. During that four month period, McKesson HBOC reduced its revenues by $327.4 million for the three prior fiscal years. The restatements all were attributed to HBOC accounting irregularities. The first announcement precipitated several lawsuits, including a derivative action pending in the Court of Chancery, captioned *Ash v. McCall*, Civil Action No. 17132. Saito was

one of four plaintiffs in the *Ash* complaint, which alleged that: (i) McKesson's directors breached their duty of care by failing to discover the HBOC accounting irregularities before the merger; (ii) McKesson's directors committed corporate waste by entering into the merger with HBOC; (iii) HBOC's directors breached their fiduciary duties by failing to monitor the company's compliance with financial reporting requirements prior to the merger; and (iv) McKesson HBOC's directors failed in the same respect during the three months following the merger. Although the Court of Chancery granted defendants' motion to dismiss the complaint, the dismissal was without prejudice as to the pre-merger and post-merger oversight claims.

In its decision on the motion to dismiss, the Court of Chancery specifically suggested that Saito and the other plaintiffs "use the 'tools at hand,' most prominently § 220 books and records actions, to obtain information necessary to sue derivatively."[2] Saito was the only *Ash* plaintiff to follow that advice. The stated purpose of Saito's demand was:

(1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co., Inc. to the acquisition of HBO & Co., Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al.,* . . . in accordance with the September 15, 2000 Opinion of the Court of Chancery.

**2.** *Ash v. McCall,* 2000 WL 1370341, *15 (Del. Ch.).

Saito demanded access to eleven categories of documents, including those relating to Arthur Andersen's pre-merger review and verification of HBOC's financial condition; communications between or among HBOC, McKesson, and their investment bankers and accountants concerning HBOC's accounting practices; and discussions among members of the Boards of Directors of HBOC, McKesson, and/or McKesson HBOC concerning reports published in April 1997 and thereafter about HBOC's accounting practices or financial condition.

After trial, the Court of Chancery found that Saito stated a proper purpose for the inspection of books and records—to ferret out possible wrongdoing in connection with the merger of HBOC and McKesson. But the court held that Saito's proper purpose only extended to potential wrongdoing after the date on which Saito acquired his McKesson stock. The court also held that Saito did not have a proper purpose to inspect documents relating to potential claims against third party advisors who counseled the boards in connection with the merger. Finally, the court held that Saito was not entitled to HBOC documents because Saito was not a stockholder of pre-merger HBOC, and, with respect to post-merger HBOC, he did not establish a basis on which to disregard the separate existence of the wholly-owned subsidiary.

## DISCUSSION

Stockholders of Delaware corporations enjoy a qualified common law and statutory right to inspect the corporation's books and records.[3] Inspection rights were recognized at common law because, "[a]s a matter of self-protection, the stockholder was entitled to know how his agents were conducting the affairs of the corporation of which he or she was a part owner."[4] The common law right is codified in 8 *Del.C.* § 220, which provides in relevant part:

> (b) Any stockholder ... shall, upon written demand under oath stating the purpose thereof, have the right ... to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.

Once a stockholder establishes a proper purpose under § 220, the right to relief will not be defeated by the fact that the stockholder may have secondary purposes that are improper.[5] The scope of a stockholder's inspection, however, is limited to those books and records that are necessary and essential to accomplish the stated, proper purpose.[6]

After trial, the Court of Chancery found "credible evidence of possible wrongdoing,"[7] which satisfied Saito's burden of establishing a proper purpose for the inspection of corporate books and records. But the Court of Chancery limited Saito's access to relevant documents in three respects. First, it held that, since Saito would not have standing to bring an action challenging actions that occurred before he purchased McKesson stock, Saito could not obtain documents created before October

---

3. *Shaw v. Agri–Mark, Inc.,* 663 A.2d 464 (Del. 1995).

4. *Id. at* 467.

5. *CM & M Group Inc. v. Carroll,* 453 A.2d 788, 792 (Del.1982).

6. *Petition of B & F Towing and Salvage Co.,* 551 A.2d 45, 51 (Del.1988).

7. *Saito v. McKesson HBOC, Inc.,* 2001 WL 818173 (Del.Ch.) at *4.

20, 1998. Second, the court concluded that Saito was not entitled to documents relating to possible wrongdoing by the financial advisors to the merging companies. Third, the court denied Saito access to any HBOC documents, since Saito never was a stockholder of HBOC. We will consider each of these rulings in turn.

## A. The Standing Limitation

■ By statute, stockholders who bring derivative suits must allege that they were stockholders of the corporation "at the time of the transaction of which such stockholder complains...."[8] The Court of Chancery decided that this limitation on Saito's ability to maintain a derivative suit controlled the scope of his inspection rights. As a result, the court held that Saito was "effectively limited to examining conduct of McKesson and McKesson HBOC's boards *following* the negotiation and public announcement of the merger agreement."[9]

Although we recognize that there may be some interplay between the two statutes, we do not read § 327 as defining the temporal scope of a stockholder's inspection rights under § 220. The books and records statute requires that a stockholder's purpose be one that is "reasonably related" to his or her interest as a stockholder. The standing statute, § 327, bars a stockholder from bringing a derivative action unless the stockholder owned the corporation's stock at the time of the alleged wrong. If a stockholder wanted to investigate alleged wrongdoing that substantially predated his or her stock ownership, there could be a question as to whether the stockholder's purpose was reasonably related to his or her interest as

a stockholder, especially if the stockholder's only purpose was to institute derivative litigation. But stockholders may use information about corporate mismanagement in other ways, as well. They may seek an audience with the board to discuss proposed reforms or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect new directors. None of those activities would be prohibited by § 327.

■ Even where a stockholder's only purpose is to gather information for a derivative suit, the date of his or her stock purchase should not be used as an automatic "cut-off" date in a § 220 action. First, the potential derivative claim may involve a continuing wrong that both predates and postdates the stockholder's purchase date. In such a case, books and records from the inception of the alleged wrongdoing could be necessary and essential to the stockholder's purpose. Second, the alleged post-purchase date wrongs may have their foundation in events that transpired earlier. In this case, for example, Saito wants to investigate McKesson's apparent failure to learn of HBOC's accounting irregularities until months after the merger was consummated. Due diligence documents generated before the merger agreement was signed may be essential to that investigation. In sum, the date on which a stockholder first acquired the corporation's stock does not control the scope of records available under § 220. If activities that occurred before the purchase date are "reasonably related" to the stockholder's interest as a stockholder, then the stockholder should be given access to records necessary to an understanding of those activities.[10]

---

**8.** 8 *Del.C.* § 327.

**9.** *Saito v. McKesson HBOC, Inc.* at *4.

**10.** As noted at page 2 above, a Section 220 proceeding does not open the door to wide ranging discovery. See *Brehm v. Eisner,* 746 A.2d 244, 266–67 (Del.2000) (Plaintiffs "bear

### B. The Financial Advisors' Documents

■ The Court of Chancery denied Saito access to documents in McKesson–HBOC's possession that the corporation obtained from financial and accounting advisors, on the ground that Saito could not use § 220 to develop potential claims against third parties. On appeal, Saito argues that he is seeking third party documents for the same reason he is seeking McKesson HBOC documents—to investigate possible wrongdoing by McKesson and McKesson HBOC. Since the trial court found that to be a proper purpose, Saito argues that he should not be precluded from seeing documents that are necessary to his purpose, and in McKesson HBOC's possession, simply because the documents were prepared by third party advisors.

■ We agree that, generally, the source of the documents in a corporation's possession should not control a stockholder's right to inspection under § 220. It is not entirely clear, however, that the trial court restricted Saito's access on that basis. The Court of Chancery decided that Saito's interest in pursuing claims against McKesson HBOC's advisors was not a proper purpose. It recognized that a secondary improper purpose usually is irrelevant if the stockholder establishes his need for the same documents to support a proper purpose. But the court apparently concluded that the categories of third party documents that Saito demanded did not support the proper purpose of investigating possible wrongdoing by McKesson and McKesson HBOC.

■ We cannot determine from the present record whether the Court of Chancery intended to exclude all third party documents, but such a blanket exclusion would be improper. The source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection rights. The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose. In this case, Saito wants to investigate possible wrongdoing relating to McKesson and McKesson HBOC's failure to discover HBOC's accounting irregularities. Since McKesson and McKesson HBOC relied on financial and accounting advisors to evaluate HBOC's financial condition and reporting, those advisors' reports and correspondence would be critical to Saito's investigation.

### C. HBOC Documents

■■ Finally, the Court of Chancery held that Saito was not entitled to any HBOC documents because he was not a stockholder of HBOC before or after the merger. Although Saito is a stockholder of HBOC's parent, McKesson HBOC, stockholders of a parent corporation are not entitled to inspect a subsidiary's books and records, "[a]bsent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent...." [11] The Court of Chancery found no basis to disregard HBOC's separate existence and, therefore, denied access to its records.

We reaffirm this settled principle, which applies to those HBOC books and records that were never provided to McKesson or

---

the burden of showing a proper purpose and [must] make specific and discrete identification, with rifled precision...[to] establish that each category of books and records is essential to the accomplishment of their articulated purpose..."); *Security First Corp. v. U.S. Die*

*Casting and Dev. Co.*, 687 A.2d 563, 568, 570 (Del.1997) ("mere curiosity or desire for a fishing expedition" is insufficient.).

11. *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 681 (Del.Ch.1978).

McKesson HBOC. But it does not apply to relevant documents that HBOC gave to McKesson before the merger, or to McKesson HBOC after the merger. We assume that HBOC provided financial and accounting information to its proposed merger partner and, later, to its parent company. As with the third party advisors' documents, Saito would need access to relevant HBOC documents in order to understand what his company's directors knew and why they failed to recognize HBOC's accounting irregularities.

## Conclusion

Based on the foregoing, the decision of the Court of Chancery is AFFIRMED in part and REVERSED in part, and this matter is REMANDED for further action in accordance with this decision. Jurisdiction is not retained.