IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WAL-MART STORES, INC., | § | |
| | § | No. 614, 2013 |
| Defendant Below, | § | |
| Appellant/Cross-Appellee, | § | |
| | § | Court Below-Court of |
| v. | § | Chancery of the State of |
| | § | Delaware |
| INDIANA ELECTRICAL WORKERS | § | C.A. No. 7779 |
| PENSION TRUST FUND IBEW, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee/Cross-Appellant | § | |

Submitted: July 10, 2014
Decided: July 23, 2014

Before **HOLLAND**, **BERGER**, and **RIDGELY**, Justices and **BUTLER** and **WALLACE**, Judges,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED.**

Donald J. Wolfe, Jr., Esquire, Stephen C. Norman, Esquire, Tyler Leavengood, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Theodore J. Boutrous, Jr., Esquire, Gibson Dunn & Crutcher LLP, Los Angeles, California, Jonathan C. Dickey, Esquire, Brian M. Lutz, Esquire, Gibson Dunn & Crutcher LLP, New York, New York, Mark A. Perry, Esquire (argued), Gibson Dunn & Crutcher LLP, Washington, DC, for appellants.

Stuart M. Grant, Esquire (argued), Michael J. Barry, Esquire, Nathan A. Cook, Esquire, Bernard C. Devieux, Esquire, Grant & Eisenhoffer, P.A., Wilmington, Delaware, for appellees.

---

[1] Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4.

**HOLLAND**, Justice:

The Defendant Below/Appellant-Cross Appellee Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") appeals from a final judgment of the Court of Chancery identifying specific steps Wal-Mart must take in searching for documents, and specific categories of documents Wal-Mart must produce, in response to a demand made by Plaintiff Below/Appellee-Cross Appellant Indiana Electrical Workers Pension Trust Fund IBEW ( "IBEW" or "Plaintiff") pursuant to title 8, section 220 of the Delaware Code.

The Court of Chancery conducted a Section 220 trial on the papers to determine whether Wal-Mart had produced all responsive documents in reply to IBEW's demand. The Court of Chancery entered a Final Order and Judgment, which required Wal-Mart to produce a wide variety of *additional* documents, including ones whose content is privileged or protected by the work-product doctrine.

Wal-Mart appeals the Court of Chancery's Final Order with regard to its obligations to provide additional documents. IBEW filed a cross-appeal, arguing that the Court of Chancery erred in failing to require Wal-Mart to correct the deficiencies in its previous document productions and in granting in part Wal-Mart's motion to strike its use of certain Whistleblower Documents.

2

We conclude that all of the issues raised in this appeal and cross-appeal are without merit. Therefore, the judgment of the Court of Chancery must be affirmed.

**Facts**

IBEW is a retirement system that provides retirement benefits to electrical workers in Indiana. Wal-Mart is a Delaware corporation that has its headquarters in Bentonville, Arkansas. Wal-Mart operates stores in 27 different countries and employs about 2.2 million people worldwide. The Company's stock is listed on the NYSE. Wal-Mart de Mexico, S.A. de C.V. ("WalMex") is a subsidiary of Wal-Mart in which Wal-Mart owns a controlling interest. WalMex is not a party to this action. At all times IBEW has been a stockholder of appellant, Wal-Mart.

On April 21, 2012, *The New York Times*, in an article titled *Vast Mexico Bribery Case Hushed Up by Wal-Mart After Top-Level Struggle* (the "*Times* Article"),[2] described a scheme of illegal bribery payments made to Mexican officials at the direction of then-WalMex CEO, Eduardo Castro-Wright, between 2002 and 2005. The *Times* Article revealed that Wal-Mart executives were aware of the conduct no later than September 21, 2005, and suggested that Wal-Mart's responses were deficient. IBEW summarized the *Times* Article in its answering brief, as follows:

---

[2] Appendix to Wal-Mart's Opening Br. at A96-116.

3

In exchange for the bribes, WalMex received benefits ranging from zoning changes to rapid and favorable processing of permits and licenses for new stores. The Company was aware of this illegal conduct by no later than September 21, 2005, when an executive of WalMex, Sergio Cicero Zapata ("Cicero"), informed the general counsel of Wal-Mart International, Maritza I. Munich ("Munich"), of "'irregularities' authorized by 'the highest levels' at [WalMex]."

Munich initiated the investigation (the "WalMex Investigation"), first hiring a Mexican attorney to interview Cicero and evaluate his allegations, and then working with Willkie Farr & Gallagher LLP ("Willkie Farr") to develop an independent investigation plan. Wal-Mart's senior leadership in the U.S., however, rejected Willkie Farr's November 2005 proposal for a "thorough investigation," and instead chose a "far more limited" internal two-week "Preliminary Inquiry" involving Wal-Mart's Corporate Investigations Department and International Internal Audit Services ("IAS") departments. The "Preliminary Inquiry" work-plan provided that, among other things, a progress report would be given to Wal-Mart's management and the Chairman of the Audit Committee, Roland Hernandez ("Hernandez"), on November 16, 2005.

Munich kept senior Wal-Mart officials in Arkansas apprised of the preliminary inquiry in a series of emails and detailed memoranda. In December 2005, an internal Wal-Mart report on the preliminary inquiry's findings was sent to Wal-Mart executives describing evidence "corroborat[ing] the hundreds of gestor payments [*i.e.*, payments to 'fixers'], the mystery codes, the rewritten audits, the evasive responses from [WalMex] executives, the donations for permits, the evidence gestores [*i.e.*, 'fixers'] were still being used." The report's conclusion was grave: "There is reasonable suspicion to believe that Mexican and USA laws have been violated."

Rather than expand the investigation, Wal-Mart executives chastised the investigators for being "overly aggressive . . . ." On February 3, 2006, Scott[3] ordered the prompt development of a "modified protocol" for internal investigations. As a result, control over the

---

[3] H. Lee Scott has been a director of Wal-Mart since 1999, Wal-Mart's CEO from 2000 to 2009, and a Wal-Mart executive officer until January 31, 2011.

WalMex Investigation was transferred to "one of its earliest targets," José Luis Rodríguezmacedo, WalMex's general counsel ("Rodríguezmacedo"). Munich complained to senior Wal-Mart executives, noting that "[t]he wisdom of assigning any investigative role to management of the business unit being investigated escapes me," and resigned from the Company shortly thereafter. Rodríguezmacedo quickly cleared himself and his fellow WalMex executive of any wrongdoing, "wrapp[ing] up the case in a few weeks, with little additional investigation[,]" and concluding that "[t]here is no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."

On June 6, 2012, Wal-Mart received a letter from IBEW (the "Demand"). The letter requested inspection of broad categories of documents relating to the bribery allegations described in the *Times* Article (the "WalMex Allegations"). The purpose of the Demand, as explained in the letter, was to investigate: (1) mismanagement in connection with the WalMex Allegations; (2) the possibility of breaches of fiduciary duty by Wal-Mart or WalMex executives in connection with the bribery allegations; and (3) whether a pre-suit demand on the board would be futile as part of a derivative suit.

On June 13, 2012, Wal-Mart responded to the Demand, agreeing, subject to certain conditions, to make available to IBEW Board materials such as minutes, agendas, and presentations, relating to the WalMex Allegations, as well as existing policies relating to Wal-Mart's Foreign Corrupt Practices Act ("FCPA") compliance. Wal-Mart declined to provide documents that it determined were not

necessary and essential to the stated purposes in the Demand or that were protected by the attorney-client privilege and work-product doctrine.

On August 1, 2012, Wal-Mart produced over 3,000 documents to IBEW, consisting of: policies relating to FCPA compliance, all Board and Audit Committee minutes and materials referencing the WalMex Allegations dating back to when those allegations arose in 2005, and Board and Audit Committee minutes and materials relating to Wal-Mart's FCPA policy and compliance program. However, most of those documents were highly redacted without any explanation for the redactions.

On August 13, 2012, IBEW filed a Complaint in the Court of Chancery pursuant to Section 220, alleging various deficiencies relating to Wal-Mart's confidentiality designations and redactions in its production, and asserting that certain documents falling within the scope of the Demand had not been produced. In an attempt to satisfy IBEW, Wal-Mart provided an additional production on August 28, 2012, which included additional documents, less redacted material, and provided the reasons for the redactions that remained.

On September 10, 2012, IBEW noticed depositions of certain Wal-Mart records custodians to gain information about documents that it believed should have been disclosed. IBEW noticed depositions of a current senior officer, a former senior officer, and a Rule 30(b)(6) witness. In response, Wal-Mart moved

for a protective order, alleging that the deposition notices encompassed virtually every document that might relate in any way to the WalMex Allegations.

At an October 12, 2012 hearing, the Court of Chancery granted Wal-Mart's motion for a protective order in part and restricted the scope of the depositions noticed by IBEW. To comply with the Court of Chancery's October 12 ruling, Wal-Mart reviewed more than 160,000 documents. To locate any additional responsive documents, Wal-Mart also interviewed a number of current and former employees, officers, and directors, and it searched the data of eleven custodians. Wal-Mart then provided IBEW with a further supplemental production and an updated privilege log. On December 6, 2012, IBEW conducted a Rule 30(b)(6) deposition.

Months earlier, in May 2012, IBEW's counsel received an anonymous package containing high-level Wal-Mart documents that were mentioned in the *Times* Article and pertained to the WalMex Investigation (the "Whistleblower Documents"). Pursuant to the ethics rules, IBEW's counsel immediately notified Wal-Mart's counsel, who stated that the documents were stolen by a former employee. Wal-Mart took no other action regarding the Whistleblower Documents, but moved to strike the documents and prevent IBEW from using them.

IBEW advised the Court of Chancery that Wal-Mart's document production did not comply with its October 12 ruling. The parties agreed to conduct a Section 220 trial on the basis of a paper record. The sole issue presented for judicial determination was whether Wal-Mart had produced all of the documents that were responsive to IBEW's Demand.

**Final Order**

On May 20, 2013, the Court of Chancery heard oral argument and ordered Wal-Mart to produce all documents in the custody of eleven custodians whose data Wal-Mart had previously searched relating to (1) the WalMex Allegations, (2) policies and procedures regarding FCPA compliance, and (3) policies and procedures relating to internal investigations. The Court of Chancery's ruling also required Wal-Mart to produce documents in the files of Roland A. Hernandez, a former director and former Chairman of Wal-Mart's Audit Committee. In addition, the Court of Chancery ordered Wal-Mart to search the files of any person who served as an assistant to any of the twelve custodians. The Court of Chancery further held that IBEW was entitled to documents protected by the attorney-client privilege, invoking the exception articulated in *Garner v. Wolfinbarger*[4] (the "*Garner* doctrine"). The Court of Chancery also ordered Wal-Mart to produce documents protected by the attorney work-product doctrine.

---

[4] 430 F.2d 1093 (5th Cir. 1970).

At a June 4, 2013 hearing on the parties' competing forms of order, the court also addressed IBEW's request for production of documents from Wal-Mart's disaster recovery (or "backup") tapes, which was made for the first time at the June 4 hearing.

On October 15, 2013, the Court of Chancery entered the Final Order and Judgment.[5] The Final Order requires Wal-Mart to produce: (1) officer (and lower)-level documents regardless of whether they were ever provided to Wal-Mart's Board of Directors or any committee thereof; (2) documents spanning a seven-year period and extending well after the timeframe at issue; (3) documents from disaster recovery tapes; and (4) any additional responsive documents "known to exist" by the undefined "Office of the General Counsel." The Final Order also requires the production of, among other things, "contents of Responsive Documents that are protected by the attorney-client privilege . . . and the contents that are protected by the attorney work-product doctrine under Court of Chancery Rule 26(b)(3)," but subject to the condition that IBEW "take appropriate steps to protect the confidentiality of [Wal-Mart's] privileged documents, including filing and maintaining any such document as confidential."[6]

---

[5] Ex. A to Wal-Mart's Opening Br. at *5 [hereinafter Final Order].

[6] Del. Code Ann. tit. 8, § 220(c) (2014) ("The Court [of Chancery] may, in its discretion, prescribe any limitations or conditions with reference to the inspection.").

The Court of Chancery also granted Wal-Mart's motion to strike IBEW's use of the Whistleblower Documents in part, allowing IBEW only to use those documents that were posted on *The New York Times* website or to the congressional website, or referenced in Wal-Mart's public filings. The Court of Chancery ruled that IBEW's request for Wal-Mart to correct the deficiencies in its previous productions had been waived.

### *Parties' Contentions*

In its appeal, Wal-Mart contends that the Court of Chancery erred in ordering Wal-Mart to produce documents that "far exceed" the proper scope of a Section 220 request. Wal-Mart cites four ways in which the Court of Chancery's Final Order is beyond the proper scope of a Section 220 proceeding: first, it requires Wal-Mart to produce officer-level documents; second, it requires Wal-Mart to produce documents spanning a seven-year period, which is longer than the period in which the wrongdoing is alleged to have occurred; third, it requires Wal-Mart to search disaster recovery tapes for data from two custodians; and fourth, it requires Wal-Mart to produce documents "known to exist" by Wal-Mart's Office of the General Counsel.

Wal-Mart further submits that the Court of Chancery improperly and incorrectly applied the *Garner* doctrine to documents that it asserts are protected by the attorney-client privilege. Additionally, Wal-Mart contends that the Court of

Chancery erred by improperly applying the *Garner* doctrine to other documents that Wal-Mart asserts constitute protected attorney work product.

In its cross-appeal, IBEW argues that the Court of Chancery erred by not ordering Wal-Mart to correct deficiencies in its search for, and collection of, books and records. The Court of Chancery held that IBEW waived this argument. IBEW submits, however, that because there was no prejudice to Wal-Mart, the issue should be decided on the merits.

In its cross-appeal, IBEW also contends that the Court of Chancery's conclusion that the Whistleblower Documents are subject to conversion is not supported by the record. According to IBEW, Wal-Mart bore the burden of proof on this conversion theory and did not provide the Court of Chancery with any record to support its ruling. IBEW argues that the Court of Chancery's inference that because the Whistleblower Documents were sent anonymously, the individual must have stolen them, is unsupported by the record.

### *Standard of Review*

Wal-Mart does not dispute that the Court of Chancery recognized that the proper standard to be applied to Section 220 actions is "necessary and essential."[7]

---

[7] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002) (quoting Del. Code Ann. tit. 8, § 220(b)).

Wal-Mart also does not dispute that IBEW stated at least one proper purpose.[8] However, Wal-Mart challenges the scope of the Final Order directing Wal-Mart to take specific steps to search for and to produce documents responsive to the Demand. According to Wal-Mart, IBEW failed to meet its burden of showing that the scope of production ordered by the Court of Chancery was "necessary and essential" to IBEW's proper purposes and that the Final Order provides IBEW with the type of discovery that is reserved for plenary proceedings.

Documents are "necessary and essential" pursuant to a Section 220 demand if they address the "crux of the shareholder's purpose" and if that information "is unavailable from another source."[9] Whether documents are necessary and essential "is fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises."[10]

The plain language of Section 220(c) provides that "[t]he Court [of Chancery] may, *in its discretion,* prescribe any limitations or conditions with reference to the inspection."[11] Accordingly, this Court reviews the Court of

---

[8] *See, e.g.*, Appendix to Wal-Mart's Opening Br. at A297 ("The only issue in dispute in this case is the extent of the corporate books and records to which Plaintiff is entitled and whether it extends beyond those documents the Company has already provided.").

[9] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011).

[10] *Id.* at 372.

[11] Del. Code Ann. tit. 8, § 220(c) (2014) (emphasis added).

Chancery's "determination of the scope of relief available in a Section 220 books and records action for abuse of discretion."[12] The standard of review this Court applies to the Court of Chancery's exercise of statutorily conferred discretion is highly deferential.[13] However, questions of law, such as the applicability of the attorney-client privilege and the work-product doctrine, are reviewed *de novo*.[14]

### Officer-Level Documents

Wal-Mart argues that the Court of Chancery abused its discretion and committed legal error by requiring it "to produce documents that were never presented to or created by members of [Wal-Mart's] Board of Directors" and by creating a "presumption" that "officer-level knowledge should be imputed wholesale to the Board." These arguments are not supported by the record for two reasons: first, IBEW's Demand had three proper purposes; and second, the Court of Chancery's ruling did not create a presumption.

---

[12] *Espinoza*, 32 A.3d at 371; *see also Security First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 569 (Del. 1997).

[13] *See, e.g.*, *Remco Ins. Co. v. State Ins. Dep't.*, 519 A.2d 633, 637-38 (Del. 1986) ("In view of the established facts and because it is the Court of Chancery in which the statute [18 *Del. C.* § 5905] vests discretion, this Court will not attempt to substitute its own notions on the matter for those carefully articulated by the Court of Chancery.") (citing *Chavin v. Cope*, 243 A.2d 694 (Del. 1968)). *See also Chavin*, 243 A.2d at 695 ("When an act of judicial discretion is under review the reviewing court may not substitute its own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness.").

[14] *Espinoza*, 32 A.3d at 371.

Wal-Mart contends that it is "undisputed that the purpose of IBEW's inspection here is limited to determining whether demand on the current Board with respect to the WalMex Allegations would be futile" and that, accordingly, officer-level documents are not "necessary and essential to [IBEW's] stated purpose." The Court of Chancery acknowledged that the purpose of IBEW's Demand "was primarily to look for facts to determine whether demand is, in fact, excused."[15] However, the other stated purposes of IBEW's Demand were to investigate the underlying bribery and how the ensuing investigation was handled.

The Court of Chancery acknowledged these other purposes. In its bench ruling ordering Wal-Mart to produce documents, the Court of Chancery explained that this information could be used for two purposes:

> [T]he core information that the petitioners probably most legitimately need in order to plead demand excusal or—and I want to be very clear about this—or to conclude that the appropriate action is an actual very strongly written demand, that why are these seven people still compliance people at Wal-Mart or in executive positions when they knew material information about legal violations, which they apparently did not share with higher-ups, and deprived the board of its ability to take effective remedial action to protect the company's reputation and interests?[16]

As the Court of Chancery explained:

---

[15] Appendix to Wal-Mart's Opening Br. at A512.

[16] *Id.* at A609-10.

14

> I believe . . . that core information regarding the WalMex bribery, construction-permitting situation and how it was handled within Wal-Mart by high-level officers and directors, that information about that is essentially central to the plaintiff's request. That is the wrongdoing they're dealing with, is did Wal-Mart deal appropriately with that? Did Wal-Mart have effective internal controls to address situations like that and did it take appropriate remedial action when it was faced with that?[17]

In fact, Wal-Mart's Opening Brief to this Court states that "the plaintiff's Section 220 purpose was to investigate allegations in [*The*] *New York Times* concerning corrupt payments supposedly made by WalMex employees in Mexico, and how Wal-Mart investigated those allegations." Therefore, Wal-Mart's argument that officer-level documents are not "necessary and essential" to one of IBEW's three proper purposes is not supported by the record.

Moreover, Wal-Mart does not dispute that key officers were involved in the WalMex Investigation. Accordingly, officer-level documents are necessary and essential to determining whether and to what extent mismanagement occurred and what information was transmitted to Wal-Mart's directors and officers.[18] In *McKesson Corp. v. Saito*,[19] this Court affirmed a Court of Chancery ruling that permitted inspection of officer-level documents. In doing so, we noted that

---

[17] *Id.* at A582-83.

[18] *See Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 118 (Del. 2002).

[19] 818 A.2d 970 (Del. 2003) (Table) (affirming a Court of Chancery opinion that required the disclosure of officer-level documents).

15

"generally, the source of the documents in a corporation's possession should not control a stockholder's right to inspection under § 220."[20]

Wal-Mart acknowledges officer-level documents that "refer[ ] to communications with members of the Board" regarding the WalMex Investigation are necessary and essential to the demand futility inquiry. However, the Court of Chancery's ruling was not limited to officer-level *communications* with directors. The Court of Chancery held that officer-level documents from which director awareness of the WalMex Investigation may be inferred are also necessary and essential to IBEW's Demand and must be produced.

Wal-Mart argues that the Court of Chancery erred by adopting a presumption that "officer-level knowledge should be imputed wholesale to the Board." The record reflects that the Court of Chancery did not adopt such a presumption. The Court of Chancery held that officer-level documents are necessary to Plaintiff's inspection because Plaintiff may establish director knowledge of the WalMex Investigation by establishing that certain Wal-Mart officers were in a "reporting relationship" to Wal-Mart directors, that those officers did in fact report to specific directors, and that those officers received key information regarding the WalMex Investigation.

---

[20] *Saito*, 806 A.2d at 118.

16

The Court of Chancery concluded that the reasonable inference from such facts would be that those officers passed the information on to the directors. The Court of Chancery's acknowledgment that a reasonable inference can be established by circumstantial evidence is not the functional equivalent of creating a presumption. The record reflects that the Court of Chancery properly exercised its discretion in ordering Wal-Mart to produce certain officer-level documents.

### Relevant Dates for Production

Wal-Mart asserts that the Court of Chancery abused its discretion with respect to the date range of production required by the Final Order. The Demand identified the relevant time period as "September 1, 2005 to the present." Wal-Mart did not object to this time period in responding to the Demand and, in fact, agreed that it was appropriate:

> The Company believes that board minutes and agendas and Company policies regarding compliance with the Foreign Corrupt Practices Act, *for the period of 2005 to the present, satisfy the necessary and essential requirement imposed by Section 220* and is therefore willing to produce them to your client.[21]

Consistent with this representation, Wal-Mart then produced documents to IBEW dated into 2012. However, at trial and in its September 2013 proposed final order, Wal-Mart sought to limit the relevant time period at December 31, 2010. IBEW argues that:

---

[21] Appendix to IBEW's Answering Br. on Appeal/Opening Br. on Cross-Appeal at B35-36 (emphasis added).

17

a key category of responsive documents essential to Plaintiff's proper purpose are documents concerning the Company's ongoing compliance activities and changes to its operative compliance procedures, such as changes to the Audit Committee's charter. These documents, including documents reflecting changes in the wake of the WalMex Investigation, will bear on director and officer knowledge of the investigation, and thus liability. Indeed, Wal-Mart's privilege log confirms that responsive documents exist from September 2005 through at least May 2012.

The Court of Chancery agreed with IBEW's argument and found that it was supported by the record. We agree. Therefore, we hold that the Court of Chancery properly exercised its discretion in setting the range of dates for production.

**Disaster Recovery Tapes for Two Custodians**

Wal-Mart argues that the Court of Chancery abused its discretion and "committed legal error in requiring the Company to collect and search the data from disaster recovery tapes for two additional custodians, or to explain why such collection would not be feasible." Some of the events relating to the WalMex Investigation occurred over seven years ago. The record reflects that Wal-Mart voluntarily collected disaster tape recovery data for nine custodians but not for the two custodians at issue.

IBEW argues that by collecting backup data for nine custodians, Wal-Mart implicitly recognizes that it may be a source of responsive documents. The Final Order requires Wal-Mart to search this data for two additional custodians or, "[i]f it is not feasible . . . provide a detailed explanation for this inability to collect [the]

18

data."[22]   The record reflects that the Court of Chancery properly exercised its discretion with regard to the production of disaster recovery tapes for the two additional custodians.

**General Counsel Documents**

Wal-Mart contends that the Court of Chancery committed legal error by ordering the production of documents "known to exist by . . . the Office of the General Counsel of Wal-Mart."[23]   According to Wal-Mart, the requirement that Wal-Mart produce documents "known to exist by" that undefined and unidentified "Office" is vague and ambiguous.   In addition, Wal-Mart submits "this type of sweeping, indiscriminate production order flies in the face of Section 220's mandate that the Court of Chancery narrowly circumscribe Section 220 relief to serve only the plaintiff's stated purpose."   Accordingly, Wal-Mart asserts that the Court of Chancery's Final Order, with respect to the Office of the General Counsel, lacks the requisite "precision."[24]

The record reflects that Wal-Mart's proposed order stated, "Defendant shall produce or log on its privilege log 1) all Relevant Data of the Identified Sources and 2) all Relevant Data of which its Litigation Counsel or its in-house counsel

---

[22]   Appendix to Wal-Mart's Opening Br. at A727.

[23]   Final Order at *3.

[24]   *See Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 372 (Del. 2011); *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 570 (Del. 1997).

charged with responding to the Demand are aware, regardless of how such Relevant Data was identified."[25] The term "Office of the General Counsel" in the Final Order replaced the "in-house counsel" term used by Wal-Mart in its proposed order. Wal-Mart contends the term "the Office of the General Counsel" is ambiguous.

In *Saito,* this Court affirmed the Court of Chancery's use of descriptive terminology, such as "representatives," "management," "employees," and "advisors."[26] Therefore, the Court of Chancery did not abuse its discretion by ordering the descriptive production of responsive documents "known to exist by . . . the Office of the General Counsel . . . ." The appropriate forum for relief from an allegedly ambiguous term is in the Court of Chancery by filing a motion for clarification.[27]

### *Garner* Doctrine Adopted

In this appeal, Wal-Mart raises two arguments regarding the *Garner* doctrine that it did not present to the Court of Chancery. First, Wal-Mart submits that the

---

[25] Appendix to Wal-Mart's Opening Br. at A717.

[26] *See Saito v. McKesson HBOC, Inc.*, 806 A.2d 113 (Del. 2002).

[27] *See, e.g.*, *New Castle County v. Pike Creek Recreational Services, LLC,* 2013 WL 6904387, at *2 (Del. Ch. Dec. 30, 2013) ("A motion for clarification may be granted where the meaning of what the Court has written is unclear."); *Naughty Monkey LLC v. MarineMax Northeast LLC*, 2011 WL 684626, at *1 (Del Ch. Feb. 17, 2011) (same).

20

*Garner* doctrine has never been adopted by this Court and therefore the availability of the *Garner* doctrine to litigants in Delaware is an open question. Second, Wal-Mart contends that, regardless of whether the *Garner* doctrine is generally available to litigants in a plenary proceeding, the doctrine should not be available to stockholders in the context of Section 220 litigation.

These two arguments are new to this litigation, neither having been presented to the Court of Chancery. Below, Wal-Mart argued only that IBEW had not shown "good cause" as required by the factors set forth in the *Garner* decision.[28] Although Wal-Mart failed to preserve either of its *Garner* arguments for appeal, "when the interests of justice so require, [this] Court may consider and determine any question not" presented to the trial court.[29] We have determined that the interests of justice require this Court to consider both of Wal-Mart's *Garner* arguments.

In *Garner v. Wolfinbarger*,[30] the Fifth Circuit Court of Appeals recognized a fiduciary exception to the attorney-client privilege when it held:

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting

---

[28] *See* Appendix to Wal-Mart's Opening Br. at A332-40.

[29] Supr. Ct. R. 8.

[30] 430 F.2d 1093 (5th Cir. 1970).

inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.[31]

The Fifth Circuit then listed several factors that should be considered when evaluating whether the plaintiff has met its "good cause" burden.[32] Thus, the *Garner* holding allows stockholders of a corporation to invade the corporation's attorney-client privilege in order to prove fiduciary breaches by those in control of the corporation upon showing good cause.

The Court of Chancery relied on the fiduciary exception to attorney-client privilege described in *Garner* to require the production of certain documents by Wal-Mart. In the trial transcript the Court of Chancery stated:

---

[31] *Id.* at 1103-04.

[32] The Fifth Circuit listed the following factors as relevant to the good cause inquiry:

> There are many indicia that may contribute to a decision of presence or absence of good cause, among them the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

*Id.* at 1104.

22

> And under *Garner*, to me, it's a classic application of *Garner*, because it's a situation where, you know, has there been—I think the shareholders—and I take them—given their role in the thing, I think they've got enough skin in the game to qualify under *Garner*.
>
> . . . .
>
> So for the documents for which attorney-client solely has been sought, I'm ordering their production under *Garner*.[33]

Wal-Mart argues that the Court of Chancery erred in applying the *Garner* doctrine because this Court has never endorsed the doctrine in a plenary proceeding, much less in a summary Section 220 proceeding. This Court has, on two occasions, tacitly endorsed, in dicta, the *Garner* doctrine. Two decades ago, in *Zirn v. VLI Corp.*,[34] this Court acknowledged that the attorney-client privilege "is not absolute and, if the legal advice relates to a matter which becomes the subject of a suit by a shareholder against the corporation, the invocation of privilege may be restricted or denied entirely."[35] Our decision in *Zirn* specifically cited the Court of Chancery's application of the *Garner* doctrine requiring "good cause" for the disclosure of privileged communications and explained that this Court "[did] not share the [Court of Chancery's] conclusion that there was no showing of good

---

[33] Appendix to Wal-Mart's Opening Br. at A586-89.

[34] 621 A.2d 773 (Del. 1993).

[35] *Id.* at 781 (citing *Valente v. Pepsico, Inc.*, 68 F.R.D. 361 (D. Del. 1975)).

cause based on direct conflict of interest . . . ."[36]  Nevertheless, in *Zirn*, this Court did not ultimately rely on the *Garner* doctrine in concluding that the privilege was waived through partial disclosure.[37]

In the context of a Section 220 action in *Espinoza v. Hewlett-Packard Co.*,[38] this Court was presented with the question of the applicability of the *Garner* doctrine, but did not reach that issue.  In *Espinoza*, we ultimately cited the plaintiff's failure to show that the documents requested were "essential" to his proper purpose as the reason for affirming the Court of Chancery's ruling, rather than the applicability of *Garner*.  This Court explained: "The 'essentiality' inquiry should logically precede any privilege or work product inquiry, because the former inquiry is dispositive of a predicate question—the scope of inspection relief to which a plaintiff is entitled under § 220."[39]

Thus, *Garner* still has not been explicitly adopted by this Court in the context of either a plenary proceeding or a Section 220 action.  On at least three occasions, however, the Court of Chancery has expressly adopted *Garner* as a valid exception to attorney-client privilege in the context of Section 220 books and

---

[36]  *Id.*

[37]  *See id.* at 781-82.

[38]  32 A.3d 365 (Del. 2011).

[39]  *Id.* at 374.

24

records actions.[40]  Of particular relevance is *Grimes v. DSC Communications Corp.*,[41] where the Court of Chancery relied on the *Garner* doctrine to compel the production of documents in a Section 220 action, despite "the different posture of [the] action from those in which courts normally analyze whether to invoke the exception to application of the attorney-client privilege."[42]  In *Grimes*, the Court of Chancery explained why its use of *Garner* was appropriate in the Section 220 demand context as follows:

> In the present action, the plaintiff seeks access to DSC's books and records in order to determine whether the board wrongfully refused his demand, and if so to assist him in meeting the particularized pleading requirements of Rule 23.1.  Plaintiff is looking down the road to a demand-refused case where the focus will be on whether or not he can establish sufficient facts to overcome the decision made by the Special Committee and the board of directors in rejecting his demand.  Thus, while as of yet no action has been filed, the current posture of the case contemplates the possible filing of a derivative suit sometime in the future.  Thus, it is appropriate to analyze whether the plaintiff has demonstrated "good cause" under the factors set forth in *Garner*.[43]

---

[40]  *See Khanna v. Covad Communications Group, Inc.*, 2004 WL 187274, at *7 (Del. Ch. Jan. 23, 2004) (discussing *Garner* and *Grimes* for the various factors to consider under the court's "good cause" analysis in a Section 220 action); *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *12-13 (Del. Ch. Nov. 13, 2002) (applying the *Garner* factors for "good cause" in a Section 220 books and records proceeding); *Grimes v. DSC Communications Corp.*, 724 A.2d 561, 568-69 (Del. Ch. 1998) (same).

[41]  724 A.2d 561 (Del. Ch. 1998).

[42]  *Id.* at 568.

[43]  *Id.* at 568-69.

25

In *Grimes*, the Court of Chancery then applied the *Garner* factors and concluded that the plaintiff had demonstrated "good cause" and was entitled to receive the disputed documents as part of its Section 220 books and records demand.[44] In summarizing its conclusion, the Court of Chancery in *Grimes* noted, "[o]f particular import is the fact that the documents sought are unavailable from any other source while at the same time their production is integral to the plaintiff's ability to assess whether the board wrongfully refused his demand—the stated purpose of his Section 220 demand."[45]

The attorney-client privilege can be traced back to Roman times and is the oldest privilege recognized by Anglo-American jurisprudence.[46] Delaware courts have agreed with the United States Supreme Court's characterization of the attorney-client privilege as "critical" to "encourag[ing] full and frank communication between attorneys and their clients and thereby promot[ing] broader public interests in the observance of law and administration of justice," including where the client is a corporation.[47] Accordingly, the *Garner* doctrine

---

[44] *Id.* at 569.

[45] *Id.*

[46] *See* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2290 (McNaughton rev. ed. 1961); *see also Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[47] *In re Lyle*, 74 A.3d 654 (Del. 2013) (Table); *see also Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993) (quoting *Upjohn*, 449 U.S. at 389); *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992); *Deutsch v. Cogan*, 580 A.2d 100, 104 (Del. 1990).

26

fiduciary exception to the attorney-client privilege is narrow, exacting, and intended to be very difficult to satisfy. It achieves a proper balance between legitimate competing interests.

We hold that the *Garner* doctrine should be applied in plenary stockholder/corporation proceedings.[48] We also hold that the *Garner* doctrine is applicable in a Section 220 action. However, in a Section 220 proceeding, the necessary and essential inquiry must precede any privilege inquiry because the necessary and essential inquiry is dispositive of the threshold question—the scope of document production to which the plaintiff is entitled under Section 220.[49]

### *Garner* Doctrine Properly Applied

Wal-Mart contends that the Court of Chancery erred in holding that IBEW met its burden of showing the predicate necessity of the privileged information sought. The record reflects that IBEW's proper purposes sought information regarding the handling of the WalMex Investigation, whether a cover-up took place, and what details were shared with the Wal-Mart Board. The Court of Chancery explained that the documents IBEW sought under *Garner* "go to those issues":

---

[48] *See Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

[49] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 374 (Del. 2011).

There is evidence in this record of indications within Wal-Mart itself by internal audit and legal staff of Wal-Mart policies, to not entrust investigations to the business unit being investigated; indications of concern about entrusting the investigation to people within the legal department at WalMex, who are actually subjects of the investigation, or should have been subjects; indications when their reports came back from WalMex that this wasn't really a good-looking report, didn't seem up to snuff, and yet nothing being done to remedy it.[50]

After finding that the privileged documents were necessary and essential to IBEW's proper purposes, the Court of Chancery considered the panoply of factors set forth in *Garner* in determining whether good cause existed to order the privileged documents to be produced. The Court of Chancery began by examining whether IBEW had demonstrated a colorable claim against Wal-Mart and whether the information was available via other means at this point in the litigation. The Court of Chancery concluded that a colorable claim existed based on "Wal-Mart's own public statements about this [which] suggest that there were some real concerns about what was going on in Mexico and whether it was legal."[51] As for the availability of the information from other, non-privileged sources, the Court of Chancery concluded:

[I]n a circumstance where judgments were made, which appear to be at odds with Wal-Mart's own internal documents in terms of how you go about things, about avoiding going to the head of a business unit— as I said, this is just not a situation where they did something internal.

---

[50] Appendix to Wal-Mart's Opening Br. at A586.

[51] *Id.*

. . . .

There wasn't a way to do it without outside counsel that doesn't involve having the business unit itself do the investigation. I don't understand how you would probe these decisions through other means.

. . . .

[B]ut where there is a colorable basis that part of the wrongdoing was in the way the investigation itself was conducted, I think it's very difficult to find those documents by other means.[52]

Wal-Mart argues that the Court of Chancery "misconstrued *Garner's* 'necessity' factor . . . ." Wal-Mart asserts that the Court of Chancery "merely found that [Plaintiff's] task would be made 'more difficult' without the production of such privileged documents." Wal-Mart's support for this assertion is one sentence where the Court of Chancery stated that, "where there's a colorable basis that part of the wrongdoing was in the way the investigation itself was conducted, I think it's very difficult to find those documents by other means." However, the entire ruling reflects that the Court of Chancery found IBEW demonstrated that the privileged information sought was "necessary and essential" to one of its proper purposes:

I'm going to start with what would ordinarily, I think, be . . . the more sensitive ruling, which is the documents which are actually on the privilege log.

---

[52] *Id.* at A588-89.

> In my view, in terms of this 220 action . . . *whether these are necessary to the plaintiff's purpose and not tangential—that's how I read "necessary and essential." Necessary and essential*, I think just emphasizes because they're redundant. I mean, usually if something is necessary, I suppose it's usually essential. But my sense is it's saying is this the core stuff? Is this out there?[53]

Wal-Mart argues that the Court of Chancery "committed legal error by expressly conflating" the Section 220 necessary and essential standard and the *Garner* good cause standard. In fact, however, the Court of Chancery properly first made the predicate Section 220 finding that the privileged information was necessary and essential before it then applied the *Garner* doctrine and found that IBEW had demonstrated good cause. This paradigm was exactly in accordance with our holding in *Espinoza*.

*Garner* also directs a trial judge to analyze "whether the communication is of advice concerning the litigation itself; [and] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing."[54] The Court of Chancery addressed these factors, as follows:

> And I think the information is particularized. It's not just a broad fishing expedition. There are specific documents. And whether the communication is advice concerning the litigation itself, no, this is not after those litigations. So I don't think it's trying to get into anybody

---

[53] *Id.* at A582 (emphasis added).

[54] *Garner*, 430 F.2d at 1104.

how to defend against what the plaintiffs are doing. This is during the real-time of Wal-Mart dealing with this thing.[55]

With regard to the other *Garner* good cause factors, the record reflects that disclosure of the material would not risk the revelation of trade secrets (at least it has not been argued by Wal-Mart); the allegations at issue implicate criminal conduct under the FCPA; and IBEW is a legitimate stockholder as a pension fund. Accordingly, the record supports the Court of Chancery's conclusion that the documentary information sought in the Demand should be produced by Wal-Mart pursuant to the *Garner* fiduciary exception to the attorney-client privilege.

### Work-Product Documents

Wal-Mart withheld certain documents based on the work-product doctrine, to which the Court of Chancery responded:

> The work product documents fall out the same way, because the core—you know you have to have this heightened need. Are they really important and urgent to what you're trying to get at and then the unavailability showing as core to that. For the same reason I mentioned with respect to *Garner*, I believe the work product doctrine documents also have to give way.[56]

Wal-Mart argues that the Court of Chancery committed legal error by purportedly applying the *Garner* doctrine to documents over which Wal-Mart invoked the work-product doctrine. The *Garner* doctrine applies to information

---

[55] Appendix to Wal-Mart's Opening Br. at A587.

[56] *Id.* at A590.

31

protected by the attorney-client privilege, but not to work product.[57] Instead, pursuant to Court of Chancery Rule 26(b)(3), a party may obtain access to non-opinion work product "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[58]

Wal-Mart asserts that the Court of Chancery erroneously applied *Garner*, rather than Court of Chancery Rule 26(b)(3), to the work-product issue. A careful reading of the *Garner* factors demonstrates that they overlap with the required showing under the Rule 26(b)(3) work-product doctrine. One factor under *Garner* is "the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources."[59] In fact, this Court has utilized the *Garner* factors in the context of a work-product analysis in the past.[60] When addressing the defendant's work-product argument in *Zirn v. VLI Corp.*, this Court stated:

---

[57] *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *11 (Del. Ch. Oct. 25, 2002) ("this Court has held that there is no *Garner* exception to the work product privilege.").

[58] Ct. Ch. R. 26(b)(3).

[59] *Garner*, 430 F.2d at 1104.

[60] *See Zirn v. VLI Corp.*, 621 A.2d 773 (Del. 1993).

[We] are satisfied that Zirn has demonstrated "good cause" for production of *documents prepared in anticipation of the patent litigation*. Of the factors set forth in *Garner v. Wolfinbarger*, which support the requisite showing of "good cause" that a shareholder must demonstrate to overcome a corporation's claim of privilege, the following appear present here.[61]

The Court of Chancery in this case recognized this overlap and utilized the same reasoning for its decision regarding the work-product doctrine. In *Grimes v. DSC Communications Corp.*,[62] the Court of Chancery also discerned the overlap in required showings and overruled a similar work-product claim: "For the same reasons that the plaintiff has shown 'good cause' to overcome the claim of attorney-client privilege, I conclude he has also shown a substantial need for the information for purposes of the work-product doctrine."[63] In this case, the record reflects that the Court of Chancery's work product ruling was properly and solely based upon Rule 26(b)(3) and only referred to the privilege rationale of *Garner* as overlapping with its own separate work product analysis.

### Cross-Appeal

IBEW's first argument in its cross-appeal is that the Court of Chancery should have required Wal-Mart to collect documents from additional custodians. The Court of Chancery found that IBEW waived this argument by not raising it in

---

[61] *Id.* at 782.

[62] 724 A.2d 561 (Del. Ch. 1998).

[63] *Id.* at 570.

its opening post-trial brief in that court. IBEW concedes its waiver[64] but asks this Court to consider its arguments on the merits. We have concluded that such consideration is not required "in the interests of justice."[65]

IBEW's second argument in its cross-appeal challenges the Court of Chancery's order requiring IBEW to return to Wal-Mart certain privileged documents that were delivered to IBEW's counsel by an anonymous source. The record reflects that a number of documents included in the anonymous mailing were publicly available on *The New York Times* website and a congressional website. Approximately three documents were not publicly available, including one document IBEW wanted to use as evidence that Wal-Mart conducted an inadequate search or previously failed to disclose all relevant documents.

Wal-Mart moved to strike all of the Whistleblower Documents, including those available to the public. According to Wal-Mart, these materials were stolen from it by a former employee and had been disseminated without Wal-Mart's consent. Wal-Mart revealed the name of the former employee it suspected of removing the documents. It also stated that the former employee worked in the IT department and that Wal-Mart had sought an order to keep him from disseminating

---

[64] *See, e.g.*, *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) (citations omitted) (finding an argument waived when it was not included in the party's opening post-trial brief).

[65] Supr. Ct. R. 8.

further information. Wal-Mart sought the Court of Chancery's assistance in securing the return of its stolen property from IBEW.

The Court of Chancery ruled that the privilege had been lost by Wal-Mart as to certain Whistleblower Documents that had been posted on websites maintained by *The New York Times* and members of Congress. However, the Court of Chancery applied a conversion theory and held that the remaining Whistleblower Documents—that is, those that have not been published by the media or elected representatives—remain privileged and therefore must be returned to Wal-Mart. The Court of Chancery determined that the anonymous nature of the mailing was strong circumstantial evidence of conversion. The Court of Chancery stated, "I'll tell you what's a really strong evidence in favor of that it was unauthorized, is that—did the person who sent it to you identify him or herself?"[66] According to the Court of Chancery, even if the "whistleblower" was in a position of authority, the fact that he or she chose to remain anonymous indicated that they did not have authority to disseminate the information.

The Court of Chancery ruled that IBEW had to return the Whistleblower Documents that were not otherwise publicly available. In arriving at its conclusion, the Court of Chancery explained:

---

[66] Appendix to Wal-Mart's Opening Br. at A449.

I look at it as if you have someone else's stuff and you shouldn't have that, then you got to give it back. We're not going to do that in a way where the entire world has the stuff, but the entire world does not have these other documents.

So I'm requiring those to be given back and I'm requiring the references to those to be stricken. I don't believe that the—the defendants—I mean, the company waived anything by proceeding in the way it did.

. . . .

Now, it might be a momentary return in a sense that that is certainly without prejudice to any argument in the – on the merits that there are responsive documents that the company didn't produce.[67]

The record reflects that the Court of Chancery properly discharged its equitable discretion in crafting a remedy for Wal-Mart, while still leaving an avenue for IBEW to ultimately obtain the returned Whistleblower Documents. The Court of Chancery's ruling was made without prejudice and allowed IBEW to address the returned Whistleblower Documents "on the merits that there are responsive documents that the company didn't produce." Thus, IBEW may still be entitled to the Whistleblower Documents it has been ordered to return if those documents should have been otherwise disclosed by Wal-Mart within the scope of the information already ordered to be produced by the Court of Chancery.

---

[67] *Id.* at A479-80.

## Scope of Relief

The Court of Chancery carefully assessed the scope of documents that should have been made available to IBEW. During the colloquy with the parties, the Court of Chancery addressed the number of custodians, the chain of corporate communications, the internal investigation policy, the issue of duplication of documents coming from different sources, and the 30(b)(6) depositions, among other issues. The record supports the Court of Chancery's conclusion that the documents it ordered to be produced satisfied the necessary and essential standard in the context of this Section 220 case.

The Court of Chancery's ruling is consistent with *Saito v. McKesson HBOC, Inc.*,[68] in which this Court held that, upon meeting the requirements of Section 220, the stockholder "should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose."[69]  "[W]here a [Section] 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem . . . ."[70]  Whether or not a particular document is essential to a given inspection purpose is fact specific

---

[68]  806 A.2d 113 (Del. 2002).

[69]  *Id.* at 115.

[70]  *Id.*

and will necessarily depend on the context in which the stockholder's inspection demand arises. In determining that "scope of relief," our courts must circumscribe orders granting inspection "with *rifled precision*."[71]

Wal-Mart contends that the Final Order was not circumscribed "with rifled precision." However, "rifled precision" also requires a fact specific inquiry and can only be determined in the context of a specific case. The term "rifled precision" requires the Court of Chancery to make a qualitative analysis of documents demanded. "Rifled precision" is not a quantitative limitation on the stockholder's right to obtain *all* documents that are necessary and essential to a proper purpose.[72] In this case, the Court of Chancery understood that "rifled precision" is a qualitative standard and must be applied contextually: "you have to—you actually have to interpret it sensibly and contextually. And in a situation like this, it's not like you're talking about a board minute or two."[73]

Wal-Mart argues that "[t]he scope of production ordered by the Chancery Court is unprecedented . . . ." In fact, however, following this Court's remand in *Saito*, the Court of Chancery entered an implementing order substantially broader

---

[71] *Id.* at 117 n.10 (citing *Brehm v. Eisner*, 746 A.2d 244, 266-67 (Del. 2000)) (emphasis added).

[72] *See Saito*, 806 A.2d 113.

[73] Appendix to Wal-Mart's Opening Br. at A566.

in scope than the Final Order entered in this case.[74] In *Saito*, the defendant-corporation appealed the implementing order, and this Court affirmed, holding that the order "was an appropriate implementation of the [stockholder's] entitlement to discovery established under this Court's decision in *Saito v. McKesson, HBOC*, 806 A.2d 113 (Del. 2002)," and involved "no abuse of discretion."[75] Comparing the order entered in *Saito* and specifically approved by this Court with the significantly more limited scope of the Final Order entered here, we hold that the Final Order constituted an appropriate exercise of discretion.

## *Conclusion*

For the reasons set forth in this Opinion, the judgment of the Court of Chancery is AFFIRMED.

---

[74] *Compare Saito v. McKesson HBOC, Inc.*, C.A. No. 18553 (Del. Ch. Sep. 20, 2002) (ORDER), *with* the Final Order.

[75] *McKesson Corp. v. Saito*, 818 A.2d 970 (Del. 2003) (Table).