# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INTER-LOCAL PENSION FUND GCC/IBT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0910-MTZ |
| CALGON CARBON CORPORATION, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  October 17, 2018
Date Decided:  January 25, 2018

R. Bruce McNew, COOCH & TAYLOR, P.A., Wilmington, Delaware; Randall J. Baron, David T. Wissbroecker, and Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California and Nashville, Tennessee; *Attorneys for Plaintiff*

Stephen C. Norman and Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Eric Landau and Travis Biffar, JONES DAY, Irvine, California; *Attorneys for Defendant*

**ZURN, Vice Chancellor.**

An institutional stockholder of a publicly traded company seeks books and records to investigate suspected mismanagement and wrongdoing under the familiar standard of 8 *Del. C.* § 220. The stockholder is purportedly concerned about the motivations for, and process leading up to, the company's acquisition.

The parties dispute a range of issues, including whether the stockholder's demand for books and records meets Section 220's form and manner requirements, and whether that demand fails as a lawyer-driven effort under *Wilkinson v. A. Schulman, Inc.*[1] due to counsel's leading role in monitoring the stockholder's investments, identifying potential issues with those investments, and drafting and prosecuting the demand and subsequent litigation. This post-trial opinion finds that the demand is technically compliant with Section 220 and that the stockholder's asserted purposes are its own. Although not all of the bases for inspection advanced by the stockholder are credible under Section 220, I conclude that the stockholder has met its burden to justify a limited investigation. I also conclude that narrowed versions of the stockholder's requested categories of documents are necessary and essential to accomplish that investigation.

---

[1] 2017 WL 5289553 (Del. Ch. Nov. 13, 2017).

## I. BACKGROUND

The facts recited in this post-trial opinion are the Court's findings based on the paper record presented at trial.[2] That record includes the pleadings;[3] the parties' joint exhibits,[4] particularly Defendant's November 28, 2017 definitive proxy statement (the "Proxy");[5] and the stipulated facts in the parties' Joint Pretrial Stipulation.[6] The following facts were either uncontested in this summary statutory action, or were proven by a preponderance of the evidence.

### A. The Parties And Relevant Nonparties

Defendant Calgon Carbon Corporation ("Calgon") is a Delaware corporation, headquartered in Moon Township, Pennsylvania, that provides filtration and decontamination products and services.[7] For the relevant periods of this action, Calgon's board (the "Board") had nine directors: Randall S. Dearth, John J. Paro, Timothy G. Rupert, J. Rich Alexander, Louis S. Massimo, Donald C. Templin, William J. Lyons, William R. Newlin, and Julie S. Roberts.[8] Dearth was Chairman

---

[2] The parties did not submit post-trial briefing. I refer to the parties' pre-trial briefing as the "Opening Br.," "Answering Br.," and "Reply Br." I refer to the trial transcript as the "Trial Tr."

[3] Docket Item ("D.I.") 1, 3.

[4] I refer to the parties' joint exhibits submitted for trial as "JX."

[5] JX 18.

[6] D.I. 54 [hereinafter the "Pre-trial Stip."].

[7] Pre-trial Stip. ¶ II(1).

[8] Opening Br. 4-5.

of the Board and Calgon's President and CEO. Calgon's executive officers included Senior Vice President and CFO, Robert Fortwangler; Executive Vice President of the Advancement Materials, Manufacturing, and Equipment Division, and former CFO, Stevan Schott; Executive Vice President of the Core Carbon and Services Division, James Coccagno; and Senior Vice President, General Counsel, and Secretary, Chad Whalen.[9] On March 9, 2018, Kuraray Co., Ltd. and its affiliates (together, "Kuraray") acquired Calgon (the "Acquisition").[10]

Plaintiff Inter-Local Pension Fund GCC/IBT (the "Fund") has been a Calgon stockholder at all times relevant to this action.[11] The Fund is an Illinois trust operated by a board of trustees.[12] Nonparty Lawrence C. Mitchell is the Fund's plan administrator and was designated to testify on behalf of the Fund under Court of Chancery Rule 30(b)(6) in this action.[13] The Fund retains nonparties Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as one of its outside counsel in connection with securities litigation.[14] Robbins Geller also represents the Fund in this action.

---

[9] *Id.*

[10] Pre-trial Stip. ¶ II(8).

[11] *Id.* ¶ II(2).

[12] Trial Tr. 30.

[13] Mitchell sat for Rule 30(b)(6) depositions on May 11 and June 28, 2018. This decision cites to the deposition transcripts as Mitchell Dep. I and II.

[14] Mitchell Dep. I at 17.

4

The Fund outsources the majority of its key investment and legal functions in a so-called "hub and spoke" model as an alternative to hiring full-time employees for those same tasks.[15]  For instance, the Fund retains Robbins Geller and other law firms under portfolio monitoring agreements.[16]  Under those agreements, the Fund relies on counsel to keep track of potential mismanagement and wrongdoing related to the Fund's investments.  At trial, the Fund's counsel produced a demonstrative of the Fund's model, summarized below:



[15] Trial Tr. 34, 50.

[16] JX 4.

**B.     Kuraray And Calgon Discuss A Potential Partnership, But Calgon States That It Is Not For Sale.**

Kuraray, a Japanese company, first contacted Calgon regarding a "potential partnership" on August 5, 2016.[17]  After some correspondence between the two companies, executives from both met on October 18 at Calgon's headquarters.[18]  In a November 29 email to a Calgon representative, Kuraray suggested further discussions, to include Dearth, of "potential collaboration such as business alliances, capital tie-up, or M&A."[19]

On January 10, 2017, Kuraray executed a non-disclosure agreement and toured Calgon's facilities.[20]  In advance of these meetings, Calgon retained financial advisor Morgan Stanley & Co. LLC ("Morgan Stanley") and counsel Jones Day.[21]  Kuraray reiterated its desire to acquire Calgon.  A Calgon representative advised Kuraray that Calgon was not for sale, but Kuraray nonetheless contacted Dearth a week after the tour to request due diligence, again pressing a potential combination

---

[17] Proxy at 30.

[18] *Id.* at 31.

[19] *Id.*

[20] *Id.*

[21] *Id.*

of the companies. On January 19, Dearth thanked Kuraray for its interest, but declined to offer due diligence and confirmed that Calgon was not for sale.[22]

Discussions between the companies continued,[23] but Kuraray's persistence faltered when Japanese news agencies reported that Japanese authorities were investigating potential antitrust violations related to companies that included Kuraray and Calgon's Japanese division.[24] After a few months, on May 31, Dearth, Coccagno, and Whalen met again with Kuraray representatives.[25] Calgon continued to assert that it was not for sale, but Kuraray nonetheless stated that it might deliver an indication of interest in June 2017.[26]

C. **Calgon Forms A Board Group To Consider Kuraray's Indication Of Interest, And The Parties Negotiate The Acquisition.**

On June 5, the Board held a special meeting to consider Kuraray's potential proposal.[27] The Board formed a working group comprising Dearth, Rupert, Newlin, Lyons, and Alexander (the "Working Group"), while retaining the ultimate decision on any transaction.[28] On June 14, Kuraray sent Dearth a draft sixty-day exclusivity

---

[22] *Id.* at 31-32.

[23] *Id.* at 32.

[24] *Id.*

[25] *Id.* at 33.

[26] *Id.*

[27] *Id.*

[28] *Id.*

7

agreement and a proposal to acquire Calgon at $20 per share, contingent on customary due diligence and the Board's approval (the "Proposal"). Under the Proposal, Kuraray would keep Calgon headquartered in the United States and would rely on the existing management and employee base.[29]

On June 29, following deliberations with Morgan Stanley and Jones Day, the Working Group determined to recommend that the Board proceed with tailored due diligence to Kuraray.[30] The Proxy indicates that the Working Group and its advisors decided it was "highly unlikely" that any other company would want to buy Calgon.[31] On July 5, the Board met and agreed with the Working Group's recommendation.[32] The next day, Dearth and Coccagno told Kuraray that Calgon would provide due diligence, but that Kuraray's Proposal of $20 per share was too low.[33]

The Board determined that its investment committee[34] should review and report to the Board on Calgon's strategic financial plan in connection with the

---

[29] *Id.*

[30] *Id.* at 33-34.

[31] *Id.* at 34.

[32] *Id.*

[33] *Id.*

[34] As detailed by the Proxy, Calgon's investment committee was tasked with, "among other things, oversee[ing] [Calgon's] financial metrics for purposes of strategic plans and

Proposal.[35]   On July 17, senior management presented the investment committee with proposed adjustments to Calgon's strategic plan.[36]   The Proxy does not detail the nature of these adjustments other than to state that the committee concluded they were "reasonable and appropriate."[37]   On July 18, the investment committee advised the Board that senior management's proposed adjustments to Calgon's strategic plan were "reasonable and appropriate," and the Board adopted the revised projections.[38]

Calgon's management continued to negotiate with Kuraray.   On August 8, Calgon formally engaged Morgan Stanley in connection with the Proposal or other possible transactions.[39]   By that time, Morgan Stanley and management had already advised the Working Group, during the June 29 meeting, on the subject of whether other companies were likely to be in a position to make a topping bid.   Morgan Stanley's engagement letter provided for a $2 million fee upon the announcement of a transaction and a second contingent fee equal to 1.44% of the ultimate transaction

---

review[ing] financial valuations in connection with mergers and acquisitions activities[.]" *Id.* at 34-35.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 35.

[38] *Id.*

[39] D.I. 82 at Ex. 1; Proxy at 36.

value upon consummation.[40]  The Proxy approximated the combined figure at $19 million.[41]

On August 21, Kuraray increased its proposal to $21.50 per share (the "Second Proposal").[42]  At an August 23 Board meeting, Morgan Stanley advised the Board that the Second Proposal compared favorably to its preliminary financial valuation of Calgon.[43]  Senior management also advised the Board that other parties were unlikely to compete with the Second Proposal.  Dearth informed the Board that, to date, "there had been no other overtures or discussions from Kuraray [other than the Proposal] to" management or Morgan Stanley about potential management retention agreements.[44]  The Board, noting that no other bids or indications of interest had emerged despite what the Proxy describes as "market rumors" of the Proposal, determined to proceed with confirmatory due diligence for an acquisition at $21.50 per share with Kuraray, but declined to extend exclusivity.[45]

---

[40] D.I. 82 at Ex. 1.

[41] Proxy at 62.

[42] *Id.* at 36.

[43] *Id.* at 36-37.

[44] *Id.* at 37.

[45] *Id.*

On August 29, Dearth and Coccagno met with Kuraray representatives while traveling for business.[46]  The Proxy indicates that Dearth and Coccagno "inferred" from indirect statements at the meeting that Kuraray still intended to retain senior management at Calgon following the Acquisition.[47]  During a September 5 Board meeting, as the parties and their advisors continued to negotiate the Acquisition, Dearth recounted the August 29 discussions.[48]  The Board directed Jones Day to ensure that Kuraray's advisors did not broach post-closing employment arrangements with Dearth, absent advance independent Board approval.[49]

At that September 5 meeting, a group of directors defined by the Proxy as "independent directors" (the "Outside Directors")[50] met without Morgan Stanley or senior management and further determined that, as phrased by the Proxy, "all other material terms of a potential transaction [should] be agreed before Mr. Dearth, or other members of the senior management team, discussed post-closing employment

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 38.

[49] *Id.*

[50] The Proxy refers to a group of "independent directors" without specifying who is in the group.  The parties' briefing and pleadings also do not clarify the composition of that group, although Calgon states that all directors but Dearth are "outside, non-management directors."  Answering Br. 52.  I refer to the group from the Proxy as the "Outside Directors" for convenience when I draw facts from the Proxy, but I do not make any findings or rulings regarding the independence of any Calgon directors in this decision.

arrangements with Kuraray."[51] Jones Day communicated the determination to Dearth and Whalen, who then told Coccagno, Schott, and Fortwangler.[52] All five individuals purportedly agreed to refrain from post-closing employment discussions with Kuraray until the Outside Directors approved otherwise.[53]

The parties continued to negotiate the Acquisition terms. On September 6, Kuraray's advisors requested a meeting with Dearth to extend an offer of post-transaction employment.[54] At a September 7 Board meeting, the Outside Directors purportedly agreed that Dearth should not receive or discuss any retention offers until the material terms of the merger agreement were negotiated, and Dearth concurred with the decision.[55] On September 14, the Outside Directors determined that the material terms were sufficiently firm to allow Dearth to now discuss post-transaction employment with Kuraray, although draft agreements were still being exchanged for the Acquisition.[56]

---

[51] Proxy at 38.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 38-39.

[56] *Id.* at 39-40.

On September 15, Dearth met with Kuraray to discuss his retention arrangements.[57] At that meeting, Kuraray provided Dearth with employment term sheets for Dearth, Coccagno, Schott, Fortwangler, Whalen, and another member of Calgon's management.[58] The Proxy discloses that each term sheet included the following benefits, among others: (i) no assumed material change in title and position, (ii) an equivalent base salary, and (iii) a one-off retention bonus, payable three years post-closing, of $1,250,000 (for Coccagno, Schott, Fortwangler, and Whalen) and $5,500,000 (for Dearth).[59]

Dearth communicated the contents of the term sheets to the Board at a September 16 meeting.[60] The Outside Directors believed that Dearth could not feasibly negotiate his retention agreement before the targeted September 21 announcement date.[61] Accordingly, they directed Jones Day to inform the relevant parties that senior management was not to negotiate personal employment arrangements with Kuraray at that time.[62]

---

[57] *Id.* at 40.

[58] *Id.*

[59] *Id.* at 40-41, 63.

[60] *Id.* at 40-41.

[61] *Id.* at 41.

[62] *Id.*

But on September 17 and again on September 18, Kuraray pressed its "critical priority" to negotiate retention arrangements with at least Dearth.[63] The Board purportedly remained steadfast in refusing to permit retention negotiations until the definitive terms of the Acquisition were set.[64] That time came soon, as, on September 19, Calgon and Kuraray agreed on the material terms, and Dearth was permitted to negotiate his retention arrangements with Kuraray.[65]

On September 20, Dearth committed to remain as CEO, with further negotiations to follow.[66] That same day, the Board adopted and approved the merger agreement.[67] On September 21, Calgon, Kuraray, and Kuraray's affiliates agreed to and executed an Agreement and Plan of Merger (the "Merger Agreement") for Kuraray to acquire Calgon at $21.50 per share in cash.[68]

As detailed in the Proxy, senior management and the Board also had a sizable amount of value in equity awards, particularly Dearth, that were convertible in large part to cash payments from the entity surviving the Acquisition. The Fund cites these equity awards as one source of its concerns with the merger process. In

---

[63] *Id.* at 41-42.

[64] *Id.* at 42.

[65] *Id.*

[66] *Id.* at 42-43.

[67] *Id.* at 43; Pre-trial Stip. ¶ II(3).

[68] Proxy at 43.

particular, the Fund points to certain of the following awards, as borne out by the Proxy:[69]

| Officer/Director | Value of Equity Awards |
| --- | --- |
| Dearth | $4,897,399 |
| Fortwangler | $672,729 |
| Schott | $1,524,276 |
| Coccagno | $1,089,919 |
| Whalen | $747,927 |
| Alexander | $237,505 |
| Lyons | $237,505 |
| Massimo | $237,505 |
| Newlin | $324,476 |
| Paro | $237,505 |
| Roberts | $439,436 |
| Rupert | $324,476 |
| Templin | $237,505 |

On November 28, Calgon issued its Proxy.

**D.    The Fund Demands Books And Records From Calgon And Sues To Enforce The Demand.**

On December 14, 2017, Robbins Geller sent a demand letter to Calgon on behalf of the Fund (the "Demand") to request books and records under Section 220.[70] The Demand asserts that "[i]t appears that the Merger Agreement and the [] Acquisition [between Calgon and Kuraray] are the product of breaches of fiduciary duty by members of the Board and/or [Calgon] management," and that the Fund

---

[69] *See* Compl. ¶¶ 10-12; Proxy at 64-67.

[70] JX 1.

15

seeks to investigate (i) "the events leading to the [] Acquisition in order to determine whether it is appropriate to pursue litigation" and (ii) "the independence and disinterestedness of the directors generally with respect to the [] Acquisition."[71]

The Demand makes thirteen requests for books and records (the "Requests"). The Requests read:[72]

> 1. Copies of all books and records provided to or referred to by the individuals who drafted the [Proxy], including all correspondence described in the Proxy;
>
> 2. Minutes of meetings of the Board or any committee thereof since August 1, 2016 (final versions or the most recent draft where final versions are not available), together with any attachments, presentations, reports, or other materials provided to Board members in preparation for or reviewed at those meetings, relating to the Merger Agreement, the [] Acquisition or any other strategic transactions/alternatives;[73]
>
> 3. Any indications of interest, term sheets, draft acquisition agreements, or similar offers relating to the Company, together with any presentations or materials in support of such offers provided to Calgon Carbon by Kuraray or any other actual of potential acquirors of Calgon Carbon;

---

[71] *Id.* at 1-2.

[72] *Id.* at 2-3.

[73] The Fund defines "strategic transactions" or "strategic alternatives" to "refer not only to alternative proposals for the acquisition of the Company, but also other potential strategic avenues, including, but not limited to, any spinoff of the Company's businesses, sales of certain business lines, acquisitions of other companies by the Company, or any other potential business strategies to be pursued by the Company." *Id.* at 2 n.1.

4. Materials provided by Calgon Carbon to its financial or other advisors, including Morgan Stanley [], since August 1, 2016 regarding the [] Acquisition and/or consideration of strategic alternatives (including, but not limited to, projections);

5. Presentations or memoranda prepared by Morgan Stanley or any other financial advisors before or after they were officially engaged, and provided to the Board or the Company's named executive officers since August 1, 2016 regarding the [] Acquisition and/or consideration of strategic alternatives;

6. Monthly, quarterly, and/or other periodic financial summaries provided to the Board or any committee thereof in connection with meetings held since August 1, 2016 concerning Calgon Carbon's historical and projected financial performance;

7. Documents, correspondence, reports or drafts thereof concerning any business plan, valuation, budget, financial guidance, forecast or projection concerning any of the assets to be acquired pursuant to the [] Acquisition, including, but not limited to, projected cash flows, revenues, income, EBIT, EBITDA or earnings per share, used for any purpose, whether relating to existing or new products or lines of business;

8. Books and records sufficient to show the interests, financial or otherwise, of any director or officer of the Company in the [] Acquisition or any strategic alternative;

9. Any materials created, modified or provided to the Board or any committee thereof since August 1, 2016 concerning the independence or non-independence of any director, including any disclosure questionnaires and any books and records relating to appointment of directors to serve or any committee of the Board;

10. All books and records reflecting communications between Randall S. Dearth, Stevan R. Schott, James A. Coccagno, Robert Fortwangler, or Chad Whalen, on the one hand, and any officer, director, employee or agent of Morgan Stanley, Goldman Sachs [], Kuraray, or any other potential acquiror of the Company or any part thereof, on the other hand, including notes, calendar entries and electronic communications[74] regarding the [] Acquisition or any other potential strategic alternatives involving Calgon Carbon;

11. Copies of all confidentiality agreements between the Company and any potential acquiror of the Company or any part thereof;

12. Copies of all engagement letter agreements between the Company and Morgan Stanley and any amendments thereto;

13. All documents produced to any other stockholder or their counsel in response to a demand pursuant to [Section] 220 or in connection with any stockholder litigation that relates to the [] Acquisition, including but not limited to [certain actions against Calgon], as well as transcripts of any depositions of Calgon Carbon officers or directors taken in connection with any such litigation.

The Demand also details the Fund's purposes for inspection, including: (i) "whether the Board's process and knowledge was sufficient to render [the Acquisition process] reasonable, or whether it was a breach of fiduciary duty under Delaware law"; (ii) "whether wrongdoing occurred in connection with (or as a result of) the[] [compensation and retention] side benefits to the Company's senior officers"; (iii) "whether the consideration offered in connection with the [] Acquisition is fair to stockholders and whether the stockholders have been

---

[74] The Fund clarifies that "[t]o be clear, this includes e-mails of directors or officers, whether or not stored on the Company's servers." *Id.* at 3 n.2.

18

adequately informed of all material facts necessary to make that determination"; and (iv) "whether wrongdoing or mismanagement has taken place such that it would be appropriate to file a breach of fiduciary duty action against the Board . . . [and] the independence and disinterestedness of the directors generally and with respect to the [] Acquisition."[75]

On December 21, Calgon responded to the Demand.[76] Calgon declined to produce any books and records and challenged the Fund's purported purposes and credible bases for the Demand, the scope of the Requests, the timing of the Demand, and the Fund's compliance with the technical requirements of Section 220.[77] On December 22, the Fund sued to enforce the Demand. Months later, on March 9, 2018, Kuraray acquired Calgon.[78]

---

[75] *Id.* at 4-7.

[76] JX 2.

[77] *Id.*

[78] Pre-trial Stip. ¶ II(8).

The action proceeded to trial before me, sitting as Master in Chancery, on July 24, 2018.[79] The parties elected to forego post-trial briefing. On October 9, after being confirmed as Vice Chancellor, I offered the parties another opportunity to submit post-trial briefing in light of the altered appellate options for this opinion.[80] On October 17, the parties elected to stand on their previous submissions.[81] I took the matter under advisement. This is my post-trial opinion.

---

[79] During pre-trial briefing, Calgon argued, in part, that Mitchell's deposition testimony demonstrated the Demand was a lawyer-driven effort and that the Fund lacked a proper purpose. As a counterstroke, the Fund attached an affidavit signed by Mitchell to its reply brief (the "Affidavit") that introduced new facts meant to distinguish the Demand from the request for stockholder inspection at issue in *Schulman*. *See* 2017 WL 528955. Calgon moved to strike the Affidavit, and, under the parameters I established, the Fund opted to offer Mitchell for a second deposition rather than withdrawing the Affidavit. Following that deposition, it was clear that Mitchell lacked the knowledge to support the Affidavit. Calgon moved to dismiss the action under Rule 41, claiming the Fund violated the Court's rules and orders (the "Motion"). On July 22, 2018, as then-Master in Chancery, I issued a draft report denying the Motion, but setting in place remedial safeguards and shifting costs in Calgon's favor (the "Report"). D.I. 78. The Report found that the Fund had threatened the legitimacy of this proceeding by: (i) failing to properly notarize the Affidavit, and (ii) submitting the Affidavit, which I found to be an entirely lawyer-drafted document that contained statements Mitchell could not support with personal knowledge. *Id.* at 17, 19-20. As a result, the Report recommended a tailored remedy: Calgon could rely on the Affidavit and second deposition for its arguments, but the Fund could not. In addition, the Report recommended that the Fund bear Calgon's fees and costs related to the Motion. *Id.* at 20-23. No party took exceptions to that Report, and it is hereby adopted by the Court.

[80] D.I. 89.

[81] D.I. 92.

## II. ANALYSIS

"Under Section 220 of [the] Delaware General Corporation Law, stockholders of a Delaware corporation may inspect the books and records of a company for any proper purpose."[82] "It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[83] "Such investigations are proper, because where the allegations of mismanagement prove meritorious, investigation furthers the interest of all stockholders and should increase stockholder return."[84] The stockholder bears the burden of proof to establish a "credible basis" in support of that proper purpose, but need only present "some evidence . . . from which the Court of Chancery could infer there were legitimate issues of possible waste, mismanagement or wrongdoing that warrant[] further investigation."[85] "The 'credible basis' standard is the lowest burden of proof known in our law[.]"[86]

The Fund purportedly made the Demand to investigate potential mismanagement or wrongdoing associated with, and the Board's independence and disinterestedness regarding, the Acquisition. Calgon challenges the Demand on a

---

[82] *Mudrick Capital Mgmt., L.P. v. Globalstar, Inc.*, 2018 WL 3625680, at *6 (Del. Ch. July 30, 2018).

[83] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) (quoting *Nodana Petroleum Corp. v. State*, 123 A.2d 243, 246 (Del. 1956)).

[84] *Seinfeld*, 909 A.2d at 121.

[85] *Id.* at 118.

[86] *Lavin v. W. Corp.*, 2017 WL 6728702, at *7 (Del. Ch. Dec. 29, 2017).

range of fronts, including that the Demand is technically defective under Section 220; that the Fund's purported purposes are not its actual purposes; that the Fund lacks credible bases for the Requests; and that the Requests are overbroad or impermissible in scope. I find that the Demand is effective under Section 220; that the Fund's purported purposes are its actual purposes; that the Fund has established credible bases presenting at least some evidence to infer possible mismanagement or wrongdoing; and that the Fund is entitled to a limited production.

### A. The Demand Letter Meets The Technical Requirements Of Section 220.

As a threshold matter, the parties dispute whether the Demand technically complies with Section 220. "Delaware courts require strict adherence to the section 220 inspection demand procedural requirements."[87] Section 220(b) requires that a stockholder make its demand "under oath." Typically, stockholders do so by notarized affidavit accompanying a demand letter. Mitchell's notarized affidavit in this case was, by its own terms, approving a version of the Demand "in substantially final form."[88] Calgon asserts that this violates Section 220(b)'s requirement that the demand be under oath because Mitchell's affidavit does not correspond to the final form of the letter.[89]

---

[87] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 145 (Del. 2012).

[88] JX 1 at 9.

[89] Answering Br. 41-44.

I find that the Demand meets Section 220(b)'s requirement of being under oath. If there were real, substantive differences between the version Mitchell reviewed and the final version sent out, then there might have been a violation of Section 220(b)'s "under oath" requirement. But there are no such differences. The Fund has explained that the only changes between the version Mitchell reviewed and the version that was sent were that the final was dated and signed.[90] Calgon has not identified any other material differences. As a result, the Demand's substance was still under oath. While the best practice is for the stockholder to review the final version of a demand letter, including the effective date, the finishing touches in this case do not rise to the level of violating Section 220's form and manner requirements.

## B. The Fund's Actual Purpose Motivated The Demand.

The parties do not contest that the Fund's professed purposes of investigating concerns of mismanagement, wrongful conduct, and the related independence of the Board, are proper under Section 220 in the abstract. They are.[91] Instead, they dispute

---

[90] Opening Br. 16-18; Reply Br. 16-17. In contrast, Calgon relies on *News Corp.*, where the Delaware Supreme Court found violations of Section 220(b) due a slew of substantive issues with the demand letter, including (i) naming the wrong entity, (ii) inconsistently documenting the stockholder's shares, and (iii) failing to include evidence of the stockholder's beneficial ownership as required by Section 220(b). *News Corp.*, 45 A.3d at 145.

[91] *See generally Seinfeld*, 909 A.2d at 121("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a proper purpose.") (quotations omitted);

23

whether those purposes are actually held by the Fund. Calgon asserts that both the Demand and this litigation are impermissibly lawyer-driven, with the Fund providing only rubber-stamped approval as a pretense for Robbins Geller's inspection of Calgon's books and records. The Fund responds that it retains Robbins Geller to monitor its investments and pursue appropriate legal action through a portfolio management agreement, and that it permissibly relies on Robbins Geller in much the same way that a large corporation might rely on its in-house legal team.[92]

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection."[93] A stockholder's demand under Section 220 may proceed under a primary proper purpose even if the stockholder has a secondary or ulterior improper purpose.[94] But because a stockholder's professed purpose may

_Beam v. Stewart_, 845 A.2d 1040, 1056 (Del. 2004) (noting the availability of Section 220 to investigate facts underlying demand futility for subsequent derivative actions); _Sec. First Corp. v. U.S. Die Casting & Dev. Co._, 687 A.2d 563, 567 (Del. 1997) ("It is well established that investigation of mismanagement is a proper purpose for a Section 220 books and records inspection."); _Amalgamated Bank v. Yahoo! Inc._, 132 A.3d 752, 784 (Del. Ch. 2016) ("Another purpose for using Section 220 is to investigate questions of director disinterestedness and independence.").

[92] Reply Br. 23-24; Trial Tr. 34-35.

[93] _CM & M Gp., Inc. v. Carroll_, 453 A.2d 788, 792 (Del. 1982).

[94] _See id._ ("[O]nce a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant."); _Doerler v. Am. Cash Exch., Inc._, 2013 WL 616232, at *5 (Del. Ch. Feb. 19, 2013) ("Any secondary purpose or ulterior motive that the stockholder may have will not bar a [Section] 220 action unless the ulterior purpose is also the stockholder's primary purpose."); _Grimes v. DSC Commc'ns Corp._, 724 A.2d

24

not be its actual purpose, "[t]he mere statement of a proper purpose . . . will not automatically satisfy [Section] 220(b)."[95] "A corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand."[96] However, "in order to succeed, the defendant must prove that the plaintiff pursued its claim under false pretenses."[97] "Such a showing is fact intensive and difficult to establish."[98]

When counsel for a stockholder presses a purpose that is different from the stockholder's actual purpose, this Court has concluded that the Section 220 demand lacks an actual purpose. In *Schulman*, this Court declined to order a production of books and records under Section 220 where "an entrepreneurial law firm initiate[d] the process, draft[ed] a demand to investigate different issues than what motivated the stockholder to respond to the law firm's solicitation, and then pursue[d] the inspection and litigate[d] with only minor and non-substantive involvement from the ostensible stockholder principal."[99] The individual stockholder in *Schulman* was

---

561, 565 (Del. Ch. 1998) ("Proper purpose has been construed to mean that a shareholder's primary purpose must be proper, irrespective of whether any secondary purpose is proper.").

[95] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007).

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Schulman*, 2017 WL 5289553, at *3. Calgon reads this language from *Schulman* as imposing a "three-part test to weed out [improper] demands." Answering Br. 23. I

25

unhappy with the company's financial results and wished to pursue inspection under Section 220 to investigate that concern. But the demand drafted and pursued by counsel sought to investigate alleged mismanagement and wrongdoing relating to an accelerated compensation award. The stockholder testified that he was not aware of any facts supporting his counsel's different concern.[100] That misalignment of goals between the stockholder and his counsel was a key factor in the Court's determination that there was no proper purpose for the demand.[101]

Here, Mitchell testified at deposition that (i) Robbins Geller determined the Demand's Requests, (ii) Robbins Geller's attorneys are the most knowledgeable persons about the purposes in the Demand, and (iii) the Fund did not independently confirm the allegations in the Demand.[102] Calgon concludes from these and other facts that "there can be no doubt that [the Fund] does not have a proper purpose for the inspection and its actual purpose is to allow its counsel to use [the Fund]'s status

---

disagree. *Schulman* was a fact-intensive analysis that relied on the record before the Court for its conclusion. *See Schulman*, 2017 WL 5289553, at *3 (concluding that "[o]n the record presented in this case, the Company proved that [the stockholder's] purported purposes were not his actual purposes"). While the presence of the same facts in another case may lead to the same result, other facts may compel a different ruling. I do not read *Schulman* as announcing a rigid test for when a purpose will be improper under Section 220.

[100] *Id.*

[101] *Id.*

[102] *See* Answering Br. 24-25; Mitchell Dep. I at 59, 66, 94, 143-44.

26

as a stockholder for its own purpose of generating litigation."[103]   But Mitchell's testimony also reveals that the Fund did not hold a purpose distinguished from those professed in the Demand, and that the Fund relied on Robbins Geller to monitor Calgon for potential losses to the Fund's portfolio and as a means to recover those losses.[104]

Section 220 litigation can be complicated, and "[a] stockholder obviously can use counsel to seek books and records."[105]  In *Schulman*, this Court recognized that "given the complexity of Delaware's sprawling Section 220 jurisprudence, a stockholder is well-advised to secure counsel's assistance."[106]  Advice from counsel comes in many forms.  Individual stockholders and smaller institutions cannot be expected to have an independent, in-house team to cultivate purely homegrown legal analyses of their investments.  Stockholders are entitled to hire counsel to review and monitor their portfolios for potential mismanagement or wrongdoing.  They are

---

[103] *See* Answering Br. 24-25.

[104] Mitchell Dep. I at 38-40, 48-49.

[105] *Schulman*, 2017 WL 5289553, at *3.  Section 220 explicitly contemplates counsel assisting stockholders. *See* 8 *Del. C.* § 220(b) ("Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from" certain books and records).

[106] *Schulman*, 2017 WL 5289553, at *3.

also entitled to rely on that counsel to raise concerns, to advise them on how to remedy those concerns, and to pursue appropriate remedies.

While the facts of this case draw close to the edge of permissibility under *Schulman*,[107] they do not cross it. Unlike in *Schulman*, the Fund's counsel did not come to it with a pre-packaged demand letter. Robbins Geller was retained far in advance and tasked with monitoring the Fund's portfolio for precisely the sort of conduct alleged in the Demand.[108] Further, and again unlike in *Schulman*, the Fund's testimony regarding its purposes aligns with those professed in the Demand and does not mirror the situation in *Schulman* where counsel usurped the process for a different purpose.[109]

Finally, Calgon points to Mitchell's inability to describe the details of the Fund's purpose and the Demand's Requests at his Rule 30(b)(6) deposition.[110]

---

[107] *See* Report.

[108] *See Schulman*, 2017 WL 5289553, at *3 (denying Section 220 demand where facts indicated that "[t]his [was] not a situation in which the stockholder client initiated the process, then counsel drafted a demand," and "[t]he event that prompted [the stockholder] to seek books and records different substantially from what [counsel] chose to explore"). In contrast, the stockholder in *Schulman* contacted his counsel after seeing their press release announcing the counsels' investigation into the relevant company and transactions. *Id.*

[109] *See id.* (denying Section 220 demand where facts indicated that "[t]he event that prompted [the plaintiff] to seek books and records differed substantially from what [counsel] chose to explore").

[110] *See* Answering Br. 12-14, 24-26.

Although Mitchell's testimony was somewhat hollow on these topics, he did testify that the Fund's purposes aligned with those in the Demand, and that the Fund was relying on the advice of counsel regarding its Requests.[111] That the Fund did not originally conceive of the purposes for the Demand and could not independently articulate the legal nuances of the Demand and its Requests at deposition is not, without more, sufficient to show that the Fund lacks a purpose.[112] To hold otherwise would largely leave Section 220 open only to sophisticated stockholders with the financial or legal training necessary to independently spot relevant corporate governance and similar issues.

For all of these reasons, Calgon has failed to make the "fact intensive and difficult to establish" showing that the Fund pursued the Demand under false pretenses.[113]

---

[111] *See, e.g.*, Mitchell Dep. I at 38-40, 69-70, 85-86.

[112] *See Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *14 (Del. Ch. Jan. 15, 2019) ("The record here does not support the conclusion that [the plaintiff] was so disengaged from the process that the actual purpose for the Demand was to benefit his counsel.").

[113] *Pershing Square*, 923 A.2d at 817.

## C. The Fund Established Credible Bases Sufficient To Infer Possible Mismanagement Or Wrongdoing.

Calgon argues that the Fund has not demonstrated the credible bases necessary to proceed with its Section 220 Demand.[114]  "The credible basis standard is the lowest burden of proof known in our law; it merely requires that the plaintiff present some evidence of wrongdoing."[115]  A stockholder need only provide sufficient evidence to infer possible mismanagement or wrongdoing,[116] not "specific, tangible evidence" of a particular claim.[117]  "The only way to reduce the burden of proof further would be to eliminate any requirement that a stockholder show *some evidence* of possible wrongdoing."[118]

The Fund has provided "some evidence" from which I can "infer . . . legitimate issues of possible waste, mismanagement, or wrongdoing that warrant[] further investigation."[119]  Using the Proxy and other publicly available information,

---

[114] Answering Br. 26-40.

[115] *Lavin*, 2017 WL 6728702, at *7 (quotations omitted).

[116] *See Yahoo! Inc.*, 132 A.3d at 786.

[117] *Oklahoma Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, 2014 WL 5351345, at *6 (Del. Ch. Sept. 30, 2014), *approved and adopted* 2015 WL 1884453 (Del. Ch. April 24, 2015); *see also In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 n.95 (Del. Ch. Feb. 28, 2018), *aff'd sub nom. UnitedHealth Grp. Inc. v. Amalgamated Bank as Tr. for Longview Largecap 500 Index Fund*, 2018 WL 5309957 (Del. Oct. 26, 2018).

[118] *Seinfeld*, 909 A.2d at 123 (emphasis in original).

[119] *Id.* at 118.  To avoid doubt, my findings on the Fund's credible bases are not rulings that the underlying claims are viable, or even that they would clear dispositive motion

the Fund tells a story of Calgon repeatedly rebuffing Kuraray until Calgon's management and Board were enticed with promises of retention, compensation, or other rewards.[120] The Fund similarly provides some evidence to cast an inference of doubt, at this early stage, on at least certain players in the Acquisition process.[121] Calgon proceeded with a largely single-bidder sale, which may be within the ambit of reasonable Board determinations for a merger,[122] but which the Fund sufficiently portrays as infected and spurred by self-interest and conflicts among the decision-makers and their advisors.[123] Central to the Fund's narrative are concerns that Calgon's directors and management set up an artificially restrictive deal process to lock in personal benefits, and accordingly failed to apprise themselves of the facts necessary for a fair and competitive sales process.[124] The Fund has put forward

---

practice in subsequent plenary litigation. *See Lavin*, 2017 WL 6728702, at *7 ("The 'credible basis' standard is the lowest burden of proof known in our law[.]").

[120] JX 1 at 4-7; Compl. ¶¶ 7-14.

[121] JX 1 at 4-7; Compl. ¶¶ 7-14.

[122] *See C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1067-68 (Del. 2014) (holding that a permissible "market check does not have to involve an active solicitation, so long as interested bidders have a fair opportunity to present a higher-value alternative, and the board has the flexibility to eschew the original transaction and accept the higher-value deal").

[123] JX 1 at 4-7; Compl. ¶¶ 7-14.

[124] JX 1 at 4-7; Compl. ¶¶ 12-13.

31

credible bases for an inspection of potential mismanagement or wrongdoing, as well as concerns about the Board's independence.

The Fund also sees wrongdoing in the nature, length, and timing of Calgon's disclosed projections.[125] The Proxy discloses that Calgon's central projections considered by the Board and provided to Morgan Stanley during the Acquisition process were from fiscal years 2017 through 2021, and that those projections were adjusted in July 2017 while the Acquisition was being negotiated.[126] The Fund asserts that the projections may have been adjusted by the allegedly conflicted management to encourage Kuraray's acquisition, and further argues that Calgon should have extended its projections beyond 2021 because the company expected a purportedly lucrative project, the so-called Ballast Water Treatment Initiative, to begin in 2019.[127] In a 2017 investor presentation, Calgon estimated the Initiative to be an $18 to $28 billion opportunity for the industry and claimed that it was "[w]ell [p]ositioned to [b]enefit" from that market as a supplier in the program.[128] The Initiative was expected to have a five-year implementation window, suggesting that

---

[125] JX 1 at 6; Compl. ¶ 15.

[126] Proxy at 34-35, 48-52.

[127] JX 1 at 6; Compl. ¶ 15; Opening Br. 12-15; Reply Br. 13-14.

[128] JX 8 at 18, 27.

Calgon might reap significant financial benefits from 2019 through 2024.[129] Calgon counters that the adjustment was merely a result of announcements delaying the implementation of the Ballast Water Treatment Initiative from 2017 to 2019, and that Calgon's expected role in the Initiative was not yet final.[130] Calgon also points out that the Fund implies a request for far more than the standard five-year projection range for financials.[131]

"[F]ive-year forecasts are routine in fairness opinions supporting mergers."[132] Were this a plenary disclosure claim, the Fund's argument might amount to little more than a "naked assertion [] that the methodology it champions would be superior."[133] But on the low credible basis standard, I conclude that the Fund has provided sufficient evidence to investigate the justification and motivation for the length of Calgon's disclosed projections and the July 2017 adjustment thereto.[134]

---

[129] Opening Br. 14.

[130] *See* Answering Br. 35. The parties dispute the Ballast Water Treatment Initiative's potential scope and timing, but Calgon does not dispute that it was expected to be a boon for the company.

[131] *Id.* 34.

[132] *Ehlen v. Conceptus, Inc.*, 2013 WL 2285577, at *3 (Del. Ch. May 24, 2013); *see also Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 511 (Del. Ch. 2010) ("In a DCF analysis, future cash flows are projected for each year during a set period, typically five years."), *aff'd,* 11 A.3d 214 (Del. 2010).

[133] *Ehlen*, 2013 WL 2285577, at *3.

[134] *Id.*

Other of the Fund's concerns are not supported by credible bases to infer mismanagement or wrongdoing. The Fund alleges that Morgan Stanley was conflicted in its duties due to a contingent fee agreement that provided for a $2 million announcement fee and a second contingent fee equal to 1.44% of the ultimate consummated transaction value (approximately $17 million, as disclosed by the Proxy).[135] "Contingent fees are undoubtedly routine; they reduce the target's expense if a deal is not completed; perhaps, they properly incentivize the financial advisor to focus on the appropriate outcome."[136] Although "[c]ontingent fee arrangements obviously can be problematic because they may incentivize advisors to prioritize the closing of the transaction over getting the best deal possible for stockholders,"[137] this Court has held that:

---

[135] D.I. 82 at Ex. 1; Proxy at 62; JX 1 at 5-6.

[136] *In re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011); *see also In re Alloy, Inc.*, 2011 WL 4863716, at *11 (Del. Ch. Oct. 13, 2011) ("Although this Court has held that stockholders may have sufficient concerns about contingent fee arrangements to warrant disclosure of such arrangements, that need to disclose does not imply that contingent fees necessarily produce specious fairness opinions.").

[137] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *20 (Del. Ch. Dec. 11, 2017).

34

[A] sales process is not unreasonable under *Revlon* merely because a special committee is advised by a financial advisor who might receive a large contingent success fee, even if the special committee is considering only one bidder. Rather, the Court can take that fact into consideration in determining whether the financial advisor failed to assist the committee in maximizing stockholder value or whether the committee failed to oversee adequately the advisor's work.[138]

Put more succinctly, "contingent fees charged by investment bankers do not create inherent conflicts."[139] I conclude that Morgan Stanley's compensation structure, standing alone, does not support a credible basis from which to infer wrongdoing. The Fund has not stated a credible basis to support an investigation into Morgan Stanley's incentives or contingency structure.[140]

Additionally, the Fund asserted more general disclosure concerns in the Demand and Complaint, although it is unclear to me whether these have been abandoned.[141] The Fund does not point to any potentially missing or suspect

---

[138] *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *23 (Del. Ch. May 20, 2011), *as revised* (Del. Ch. May 24, 2011).

[139] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *21 (Del. Ch. Mar. 31, 2017) (summarizing *In re Smurfit-Stone Container Corp.*), *as revised* (Del. Ch. Apr. 11, 2017); *see also Se. Pa. Transp. Auth. v. Volgenau*, 2013 WL 4009193, at *16 (Del. Ch. Aug. 5, 2013) (finding that financial advisor's fees did not taint incentives when 84% of the expected compensation was contingent in nature), *aff'd*, 91 A.3d 562 (Del. 2014).

[140] That is especially true in light of the fact that the Demand requests a copy Morgan Stanley's engagement letter and Calgon filed a copy after trial. D.I. 82.

[141] JX 1 at 6; Compl. ¶ 17. The Fund did not argue these claims in any specific manner in its Opening or Reply Brief, or at trial, and Calgon insists that the Fund has abandoned them. *See* Answering Br. 2, 39; Trial Tr. 147.

information beyond the length of Calgon's projections, addressed above. I conclude the Fund has not established a credible basis to infer mismanagement or wrongdoing in the context of Calgon's general Proxy disclosures.

Many of Calgon's arguments against the Fund's proffered credible bases are merits contentions that are best reserved for any potential plenary litigation that may follow the Demand.[142] For instance, Calgon argues that (i) the analyst reports the Fund cites as evidence of an inadequate deal price are contradicted by other analyst reports,[143] (ii) the Fund's assertion of wrongdoing based on Calgon's largely single-bidder process and allegedly self-interested sales process is defeated by the Delaware Supreme Court's *C & J Energy Services* decision,[144] (iii) the Merger Agreement's deal protection provisions are "not evidence of wrongdoing,"[145] (iv) the Fund's concerns with management's employment and compensation arrangements are underdeveloped and refuted by the Board purportedly policing

---

[142] "A company engages in a merits defense when it seeks to rebut the plaintiff's allegations as to purpose by arguing that the alleged conduct never occurred or was proper." *Norman v. US MobilComm, Inc.*, 2006 WL 1229115, at *5 (Del. Ch. Apr. 28, 2006).

[143] Answering Br. 27-28.

[144] *Id.* 28-31; *see C & J Energy Servs., Inc.*, 107 A.3d at 1067-68.

[145] Answering Br. 32.

36

those arrangements,[146] and (v) the Outside Directors' receipt of cash for accelerated equity awards aligned their interests with stockholders.[147]

The Fund's credible bases are not defeated by Calgon's merits contentions.[148] "This Court has repeatedly stated that a Section 220 proceeding does not warrant a trial on the merits of underlying claims."[149] "[A] stockholder need not prove actual

---

[146] *Id.* 36-37.

[147] *Id.* 38-39.

[148] Even if these arguments applied at this early stage, they would not defeat the Fund's showing of a credible basis. Calgon argues that *C & J Energy Services* stymies the Fund's attempt to find wrongdoing in a single-bidder process. The Fund acknowledges that "the decision to sell a company through a single-bidder process . . . [is] not inherently wrongful," but contends that it has provided some evidence that Calgon's fiduciaries and advisors made debatable, conflicted choices relating to that process. Reply Br. 5-6; *see generally RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 855 (Del. 2015) (holding that "where undisclosed conflicts of interest exist, [] decisions must be viewed more skeptically" under *Revlon*); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *44 (Del. Ch. Oct. 16, 2018) ("Where undisclosed conflicts of interest exist, however, even otherwise reasonable choices must be viewed more skeptically.") (quotations omitted). Similarly, while directors' receipt of accelerated equity awards often aligns their interests with stockholders, in some circumstances "[t]he timing of [] equity awards [may] bolster[] Plaintiff's self-interest theory." *In re Saba Software, Inc.*, 2017 WL 1201108, at *21. Calgon's arguments do not defeat the Fund's presentation of "some evidence" towards its proper purposes. *Seinfeld*, 909 A.2d at 123.

[149] *In re UnitedHealth Grp., Inc.*, 2018 WL 1110849, at *7; *see also Lavin*, 2017 WL 6728702, at *9 ("Thus, when a stockholder demands inspection as a means to investigate wrongdoing in contemplation of a class or derivative action, Delaware courts generally do not evaluate the viability of the demand based on the likelihood that the stockholder will succeed in a plenary action."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *6 (Del. Ch. Apr. 28, 2004) (permitting merits defenses "would turn on its head both [Section] 220 and the case law upholding a books and records inspection for the purpose of investigating mismanagement"); *Khanna v. Covad Commc'ns Grp., Inc.*, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004) (litigating the underlying merits of potential claims that a stockholder seeks to investigate under Section 220 "would defeat the purposes of

37

wrongdoing as a Section 220 action is not a full trial on the merits."[150] Stockholders may meet the credible basis standard notwithstanding skepticism of the underlying claims. Even if certain of Calgon's merits arguments turn out to be correct in subsequent plenary litigation, they cannot bar the Fund from asserting its rights to inspect books and records under Section 220.

For the foregoing reasons, I conclude that the Fund has provided some evidence from which I can infer legitimate issues of possible mismanagement or wrongdoing.

### D. The Fund's Proper Purposes Support An Investigation Into Actionable Corporate Wrongdoing At This Stage.

Having ruled that the Fund's Demand meets the form and manner requirements of Section 220, that the Fund's proffered purposes are its actual purposes, and that the Fund established credible bases to infer possible mismanagement or wrongdoing, I turn now to Calgon's argument that any subsequent plenary action would be precluded by its exculpatory provision under 8 *Del. C.* § 102(b)(7).[151] As this Court held in *Southeastern Pennsylvania*

---

this summary proceeding and the underlying policy guidance that potential plaintiffs use the procedures of Section 220 to determine if a case exists for the shareholder to pursue").

[150] *Caspian Select Credit Master Fund Ltd. v. Key Plastics Corp.*, 2014 WL 686308, at *4 (Del. Ch. Feb. 24, 2014).

[151] Calgon represents that it has a Section 102(b)(7) provision. *See* Trial Tr. 148; JX 2 at 5. Corporations may exculpate directors from certain monetary damages for breaches of the duty of care under Section 102(b)(7). *See Emerald Partners v. Berlin*, 787 A.2d 85, 91

38

*Transportation Authority v. AbbVie Inc.*, later affirmed by the Supreme Court, a stockholder must offer some evidence of "actionable corporate wrongdoing" to support a Section 220 demand in the context of an exculpatory provision.[152] This Court explained in *AbbVie I* that:

> Because a Section 102(b)(7) exculpatory provision serves as a bar to stockholders recovering for certain director liability in litigation, a stockholder seeking to use Section 220 to investigate corporate wrongdoing solely to evaluate whether to bring derivative litigation has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing.[153]

Calgon argues that the Court must deny the Demand because the Fund has not provided sufficient grounds for a non-exculpated claim in future litigation.[154] Although the Fund must provide some evidence of non-exculpated claims to demonstrate actionable corporate wrongdoing under Section 220,[155] the *AbbVie I* Court "stress[ed] that this burden . . . remains among the lightest burdens recognized

---

(Del. 2001) ("Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based exclusively upon establishing a violation of the duty of care.").

[152] *Se. Pa. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015) (*AbbVie I*), *aff'd* 132 A.3d 1 (Del. 2016) (together, "*AbbVie*").

[153] *AbbVie I*, 2015 WL 1753033, at *13.

[154] Answering Br. 40-41.

[155] The parties do not contest that the Fund is pursuing the Demand to explore potential litigation.

in our jurisprudence."[156] I have already ruled that the Fund established credible bases to investigate wrongdoing as asserted in its Demand. The Fund's claims include suspected breaches of the duty of loyalty,[157] which cannot be exculpated.[158] Moreover, a number of the potential defendants for those claims are officers, not directors. This Court has declined to apply *AbbVie* where there existed "the possibility of a claim against [a potential defendant] in her capacity as an officer" because "Section 102(b)(7) does not authorize exculpation for officers."[159] Calgon does not address this point, although the Fund raised it in its Opening Brief.[160]

---

[156] *AbbVie I*, 2015 WL 1753033, at *13.

[157] *See, e.g.*, JX 1 at 4 ("Similarly, it appears that the [] Acquisition was driven by the self-interests of the Company's directors and/or officers, and that the Company's disclosures to stockholders about the [] Acquisition are materially incomplete and/or misleading."); Opening Br. 29. I note that, at this stage, the independence or disinterestedness of the Outside Directors has not yet been established. In fact, it is the subject of one of the Requests and a stated purpose for investigation in the Demand.

[158] 8 *Del. C.* § 102(b)(7) (providing that the exculpatory provision "shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit").

[159] *Yahoo! Inc.*, 132 A.3d at 787; *see also Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

[160] *See* Opening Br. 28-29.

40

Because none of the Fund's purposes or Requests bear exclusively on exculpated claims, *AbbVie* does not preclude any purpose or Request.[161]

Calgon also asserts, albeit in a single footnote, an argument that the Supreme Court's *Corwin* doctrine[162] cleansed any of the Fund's potential claims because a majority of Calgon's stockholders approved the Acquisition and the Fund has, according to Calgon, abandoned its disclosure claims.[163] Calgon acknowledges this point is contrary to current Delaware law under *Lavin v. West Corp.*,[164] but asserts, to "preserve[] . . . for appeal," that (i) *Lavin* is inconsistent with *AbbVie*, and (ii) this case is distinguishable from *Lavin* because that case involved disclosure claims.[165] For the reasons addressed exhaustively in *Lavin*, I agree that *Corwin* is a merits defense that may not bar Section 220 claims.[166] I also do not read *Lavin* to turn on

---

[161] *See Yahoo! Inc.*, 132 A.3d at 787 (where the stockholder's claims involved non-exculpated claims and parties, "[i]t would be premature on the facts presented to allow [the company] to rely on its exculpatory provision to foreclose [the stockholder] from investigating further").

[162] *See Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2015). *Corwin* provides that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies." *Id.* at 309.

[163] Answering Br. 41 n.28.

[164] This Court recently held in *Lavin* that the *Corwin* doctrine does not bar Section 220 claims. *Lavin*, 2017 WL 6728702, at *7-10.

[165] *Id.*

[166] The *Lavin* Court was, of course, aware of *AbbVie* when it ruled, and cited *AbbVie I* directly. *Lavin*, 2017 WL 6728702, at *9 n.75.

whether a Section 220 demand includes an investigation of disclosure claims as a professed purpose. But, in any case, the Fund has shown a credible basis to investigate the disclosure of Calgon's projections. *Corwin* does not bar the Fund's Demand.[167]

Relatedly, Calgon asserts that the Fund lacks a proper purpose because it ultimately voted a number of shares in favor of the Merger, and that the Fund thus acquiesced to the Merger and cannot challenge it in later plenary litigation.[168] In support of this argument, Calgon cites *Bershad v. Curtiss-Wright Corp.*, which held that "[a]n informed minority shareholder . . . who either votes in favor of a merger or accepts the benefits of the transaction cannot thereafter attack the fairness of the merger price."[169] Calgon devotes only a few sentences to this argument, and neither

---

[167] As the Court stated in *Lavin*, in so ruling:

> I do not mean to diminish the pleading stage business judgment deference that must be afforded fiduciaries whose decisions are approved by properly informed disinterested stockholders freely exercising their right to vote their shares. Nor do I intend to suggest that the fiduciaries [the Fund] may choose to name in a plenary action will not prevail should they invoke *Corwin* in a motion to dismiss [the Fund]'s complaint.

*Id.* at *10.

[168] *See* Answering Br. 21-22. The parties clash on the specifics of these facts, including whether the Fund's advisor voted the shares and, if so, whether that makes a difference. *See id.*; Reply Br. 10-11.

[169] 535 A.2d 840, 842 (Del. 1987).

party provided authority addressing whether acquiescence under *Bershad* is fairly considered in a summary Section 220 proceeding.

It is unclear to me whether a party may properly assert acquiescence as a defense to a Section 220 demand. But even if Calgon could properly assert that defense, I find that *Bershad* does not undercut the Fund's evidence of actionable corporate wrongdoing. In order for Calgon's acquiescence defense to preclude the Demand, it would have to show that the Fund's litigation prospects are "simply not justiciable" or otherwise "not viable as a matter of law" on the limited merits review and summary record under Section 220.[170] But *Bershad* applies only to informed stockholders.[171] As I have already found that the Fund states a proper purpose to investigate Calgon's disclosures related to projections, *Bershad*'s application would require a premature merits ruling on that claim. I decline to wade through the merits in this summary statutory action.

For these reasons, the Fund has presented sufficient evidence of actionable corporate wrongdoing for purposes of Section 220.

---

[170] *Lavin*, 2017 WL 6728702, at *9 (quotations omitted) (collecting cases regarding the viability of underlying claims to a Section 220 demand).

[171] *Bershad*, 535 A.2d at 848 ("However, when an informed minority shareholder either votes in favor of the merger, or like Bershad, accepts the benefits of the transaction, he or she cannot thereafter attack its fairness.").

### E. The Fund Is Entitled To Those Books And Records That Are Necessary And Essential To Its Purposes.

"The scope of inspection is limited to only those books and records that are 'necessary and essential to accomplish the stated, proper purpose.'"[172] "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[173] "The plaintiff bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."[174] To carry its burden, the Fund must "make specific and discrete identification, with rifled precision, of the documents sought."[175] "The inspection should stop at the quantum of information . . . 'sufficient' to accomplish the plaintiff's stated purpose. If the books and records are not 'essential' for the stockholder's purpose, then the stockholder already has 'sufficient' information and

---

[172] *Mudrick Capital Mgmt., L.P.*, 2018 WL 3625680, at *7 (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002)).

[173] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett–Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011)).

[174] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[175] *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000); *see also Wal-Mart Stores, Inc.*, 95 A.3d at 1283 ("The term 'rifled precision' requires the Court of Chancery to make a qualitative analysis of documents demanded. 'Rifled precision' is not a quantitative limitation on the stockholder's right to obtain all documents that are necessary and essential to a proper purpose.").

the inspection can be denied as seeking materials beyond what is 'needed to perform the task.'"[176]

Many of the Fund's Requests are overbroad, as they seek documents that are not necessary or essential to its purposes, or are not in pursuit of an investigation for which the Fund has established a credible basis.[177] However, the Fund is entitled to a production responsive to Request Nos. 2,[178] 3, 5, 6, 7, 8, 9, 10, and 11, as tailored by the parties following the Demand, including in the pre-trial briefing.[179]

---

[176] *Yahoo! Inc.*, 132 A.3d at 788 (quoting *Thomas & Betts Corp.*, 681 A.2d at 1035; *Carapico v. Philadelphia Stock Exch., Inc.*, 791 A.2d 787, 793 (Del. Ch. 2000)).

[177] Request No. 1 seeks all materials involved in drafting the Proxy, including all correspondence described therein. That broad range is not necessary and essential to the Fund's limited inspection. *See Lavin*, 2017 WL 6728702, at *14 n.104 (rejecting similar request as overbroad). Request No. 4 seeks all materials Calgon provided to its advisors. The Fund has not provided a credible basis to infer possible wrongdoing related to the advisors' conduct, and this Request is not crafted with "rifled precision" to investigate those credible bases the Fund has provided. *See Brehm*, 746 A.2d at 266. I also deny inspection under Request No. 12, which seeks engagement letters between Calgon and Morgan Stanley, for those same reasons, and because Calgon already provided the engagement letter related to the Acquisition. *See* D.I. 82 at Ex. 1. Request No. 13 seeks books and records provided to satisfy other Section 220 demands or litigation regarding the Acquisition. That, too, is overbroad and fails to confine itself to necessary and essential documents. *See Lavin*, 2017 WL 6728702, at *14 n.104 (rejecting similar request as overbroad).

[178] *See also Yahoo! Inc.*, 132 A.3d at 790 ("The starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered.").

[179] *See, e.g.*, Reply Br. 29-30 (limiting Request No. 7 to "documents created or distributed on or after August 1, 2016").

45

I impose the following limitations to further focus Calgon's production. The Requests' definition of "strategic alternatives," which threatens to unjustifiably expand the production's scope, shall be read to relate only to alternative acquisition proposals for Calgon. Requests dealing with Calgon's financials, business plans, valuations, or projections shall be limited to the issues of (i) Calgon's projection adjustments during the sale process, and (ii) the consideration of forecasts or projections relating to the Ballast Water Treatment Initiative[180] that expanded beyond the time period ultimately disclosed in the Proxy.

Request No. 10 is facially the broadest Request that I approve. It seeks communications between Calgon's management, on the one hand, and Morgan Stanley, Kuraray, or Goldman Sachs (Kuraray's financial advisor) on the other, including email communications.[181] This Request presents two issues: its request for personal electronic communications, and its breadth.

---

[180] *See* Compl. ¶ 15; *supra* text accompanying notes 127-130.

[181] Request No. 10 reads: "All books and records reflecting communications between Randall S. Dearth, Stevan R. Schott, James A. Coccagno, Robert Fortwangler, or Chad Whalen, on the one hand, and any officer, director, employee or agent of Morgan Stanley, Goldman Sachs [], Kuraray, or any other potential acquiror of the Company or any part thereof, on the other hand, including notes, calendar entries and electronic communications regarding the [] Acquisition or any other potential strategic alternatives involving Calgon Carbon," and the Fund notes that "[t]o be clear, this includes e-mails of directors or officers, whether or not stored on the Company's servers."

I address the electronic communications first. "This court has the power to order production of documents prepared by officers and employees as part of a Section 220 inspection."[182] "A corporate record retains its character regardless of the medium used to create it."[183] Those mediums include email and similar communication methods. "The reality of today's world is that people communicate in many more ways than ever before, aided by technological advances that are convenient and efficient to use."[184] "Not surprisingly, Delaware precedents have ordered the production of electronic documents and emails in Section 220 actions."[185]

Corporate records are not always confined to the company's premises, domain name, and servers. Where directors and officers conducted company business outside of company email addresses, this Court has ordered production from their responsive personal accounts and devices.[186] "[W]hen considering requests for

---

[182] *Yahoo! Inc.*, 132 A.3d at 791.

[183] *Id.* at 793.

[184] *Papa John's Int'l, Inc.*, 2019 WL 194634, at *16.

[185] *Yahoo! Inc.*, 132 A.3d at 792-93 (collecting cases).

[186] *See Wal-Mart Stores, Inc.*, 95 A.3d at 1272-74 (affirming production of documents from officers and employees); *Papa John's Int'l, Inc.*, 2019 WL 194634, at *15-16 (permitting production of directors' personal emails and text messages); *Yahoo! Inc.*, 132 A.3d at 791-93 (permitting production of CEO's personal emails); *but see In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *5-7 (Del. Ch. Apr. 30, 2015) (declining to permit production of directors' personal emails).

information from personal accounts and devices in Section 220 proceedings, the court should apply its discretion on a case-by-case basis to balance the need for the information sought against the burdens of production and the availability of the information from other sources, as the statute contemplates."[187] The core inquiry remains the same: whether the record is necessary and essential to the stockholder's investigation.[188]

In this case, the Fund seeks electronic communications, including emails, to investigate the discussions between Calgon's management and third parties to determine if management prioritized their own retention and compensation over the interests of Calgon's stockholders. Such communications may go to the very heart of the Fund's proper purpose for this Request. The nature of those communications means that the Fund is unlikely to uncover any meaningful answers in more traditional, formal books and records, like minutes or letters between the companies. I find that those communications are necessary and essential, including personal electronic communications to the limited extent they are not duplicative of sources from company emails and devices.[189]

---

[187] *Papa John's Int'l, Inc.*, 2019 WL 194634, at *16.

[188] *See Yahoo! Inc.*, 132 A.3d at 793 ("As with other categories of documents subject to production under Section 220, what matters is whether the record is essential and sufficient to satisfy the stockholder's proper purpose, not its source.").

[189] The parties have not briefed the custodial sources for these potential documents.

As for the breadth of Request No. 10, I take guidance from *Lavin*, which approved a narrowed version of a similar request. There, the stockholder requested:

> All books and records reflecting communications between [six officers and directors], on the one hand, and any officer, director, employee or agent of [the Company's financial advisor], [the acquiror's financial advisor], [the acquiror], or any other potential acquiror of the Company or any part thereof, on the other hand, including notes, calendar entries and electronic communications regarding the Proposed Acquisition or any other potential strategic alternatives involving [the Company].[190]

The Court found that the request "landed with the precision of buckshot" and instead approved only:

> [B]ooks and records reflecting communications related to a potential sale of one or more of West's segments between [five officers and directors], on the one hand, and any officer, director, employee or agent of [the company's financial advisor] or any potential acquirer of any part of the Company, on the other hand, from January 1, 2016 to July 26, 2017, including (but not limited to) emails, memoranda and notes.[191]

I similarly find that only a subset of the documents sought by Request No. 10 are necessary and essential for the Fund to investigate their concerns of improper retention and compensation discussions between management and Kuraray. The following is necessary and sufficient on this record to investigate the Fund's concerns: documents reflecting communications between Dearth, Schott, Coccagno, Fortwangler, Whalen, on the one hand, and any officer, director, employee, or agent

---

[190] Verified Complaint, *Lavin v. West Corp.*, C.A. No. 2017-0547, at ¶ 22(10) (Del. Ch. July 27, 2017).

[191] *See Lavin*, 2017 WL 6728702, at *14.

of Kuraray or other potential acquirers, on the other hand, regarding the retention or compensation of Calgon officers and management related to the Acquisition or any strategic alternative.

Finally, the parties' ultimate order implementing the production shall (i) impose reasonable start and end dates, to the extent not already provided, to bookend the collection scope for the Requests,[192] and (ii) be subject to appropriate confidentiality and incorporation-by-reference conditions.[193]

### F.      The Fund's Request For A Ruling On Privileged Documents Is Not Ripe.

The Fund also requests a ruling that "Calgon may not, under Delaware law, withhold documents on the basis of" a preemptively asserted attorney-client privilege, under the doctrine laid out in *Garner v. Wolfinbarger*.[194] The Delaware Supreme Court has adopted the so-called *Garner* exception to the attorney-client

---

[192] The date of the Acquisition appears to be a natural end-date, although the parties may agree on an earlier or later date if it appears appropriate for a Request.

[193] Pre-trial Stip. ¶ IV(B) ("To the extent that any inspection is granted, Calgon seeks to require that any production be subject to a confidentiality agreement and an incorporation-by-reference condition."); *see generally City of Cambridge Ret. Sys. v. Universal Health Servs., Inc.*, 2017 WL 4548460, at *3 (Del. Ch. Oct. 12, 2017) (finding incorporation-by-reference provisions permissible under Section 220); *Disney v. Walt Disney Co.*, 857 A.2d 444, 448 (Del. Ch. 2004) ("[I]t is often the case that the Court of Chancery will condition its judgment in Section 220 cases on the entry of a reasonable confidentiality order[.]").

[194] Opening Br. 45-48; 430 F.2d 1093 (5th Cir. 1970).

privilege in both plenary proceedings and Section 220 actions.[195] The *Garner*

doctrine "allows stockholders of a corporation to invade the corporation's attorney-

client privilege in order to prove fiduciary breaches by those in control of the

corporation upon showing good cause."[196] Delaware courts applying *Garner* in the

Section 220 context consider:

> (i) the number of shares owned by the shareholder and the percentage
> of stock they represent; (ii) the assertion of a colorable claim; (iii) the
> necessity of the information and its unavailability from other sources;
> (iv) whether the stockholder has identified the information sought and
> is not merely fishing for information; and (v) whether the
> communication is advice concerning the litigation itself.[197]

---

[195] *Wal-Mart Stores, Inc.*, 95 A.3d at 1278.

[196] *Id.* at 1276.

[197] *Grimes*, 724 A.2d at 568. As adopted by the Supreme Court, *Garner* also identified the following generally relevant factors:

> [1] the number of shareholders and the percentage of stock they represent;
> [2] the bona fides of the shareholders; [3] the nature of the shareholders'
> claim and whether it is obviously colorable; [4] the apparent necessity or
> desirability of the shareholders having the information and the availability of
> it from other sources; [5] whether, if the shareholders' claim is of wrongful
> action by the corporation, it is of action criminal, or illegal but not criminal,
> or of doubtful legality; [6] whether the communication is of advice
> concerning the litigation itself; [7] the extent to which the communication is
> identified versus the extent to which the shareholders are blindly fishing; and
> [8] the risk of revelation of trade secrets or other information in whose
> confidentiality the corporation has an interest for independent reasons.

*Wal-Mart Stores, Inc.*, 95 A.3d at 1276 n.32 (quoting *Garner*, 430 F.2d at 1104).

The Fund's request for a *Garner* ruling is not ripe.[198] Calgon has not yet produced any documents, nor has it identified a set of privileged documents against which to apply the *Garner* doctrine. The Fund clarified in briefing that it does not oppose revisiting this issue following Calgon's identification of privileged documents responsive to the Demand, if any.[199] Accordingly, I deny the Fund's request for a ruling on this ground without prejudice.

## III.  CONCLUSION

Calgon shall provide the books and records contemplated by this opinion and subject to its terms, including the requirement to log any privileged materials. The parties shall submit an order consistent with this opinion within five business days. Each party shall bear its own costs, except as laid out in the Report.

---

[198] *Yahoo! Inc.*, 132 A.3d at 796 (in the context of applying *Garner* to a Section 220 proceeding, determining that the company must identify privileged materials, but, at that time, it was "premature for this court do anything other than require [the company] to log documents").

[199] *See* Reply Br. 31.